# LANSBURGH *v.* THE DISTRICT OF COLUMBIA.

CONSTITUTIONAL LAW; POLICE POWERS; GIFT ENTERPRISES.

1. Congress has the same police powers in the District of Columbia as the State legislatures have within their several jurisdictions.

2. It is only where a statute purporting to exercise police powers has no real or substantial relation to the protection of the public health, safety, peace and morals, or is a palpable invasion of the rights secured by the fundamental law, that the courts will declare it void.

3. An enterprise by which a trading stamp company distributes among merchant subscribers so-called trading stamps for distribution to customers according to the amounts of their purchases, which stamps when collected in sufficient numbers entitle the holders to premiums supplied by the company, is within the meaning of the act of Congress of February 17, 1873 (R. S. D. C., Secs. 1176 and 1177), prohibiting gift enterprises in the District of Columbia.

No. 749. Submitted November 16, 1897. Decided December 7, 1897.

IN ERROR to the Police Court of the District of Columbia. *Affirmed.*

The COURT in its opinion stated the case as follows:

The plaintiffs in error were convicted in the Police Court of the District of Columbia and sentenced to pay fines of $100 each, under an information charging them with having "engaged in the business of a gift enterprise." The trial was by the court, a jury having been waived, and the judgment of conviction was rendered upon evidence disclosing the following facts:

The defendant, Gustave Lansburgh, is a member of a partnership styled Lansburgh & Bro., engaged in business in the city of Washington, as retail merchants. Defendant, Joseph A. Sperry, is the managing officer of a private corporation, called Washington Trading Stamp Company, the principal office of which is in the city of New York.

On October 5, 1897, Lansburgh & Bro. entered into a written contract with the Washington Trading Stamp Company, in substance as follows:

"WASHINGTON, D. C., Oct. 5, 1897.

"This agreement, by and between the Washington Trading Stamp Co., of Washington, D. C., parties of the first part, and Lansburgh & Bro., of Washington, D. C., party of the second part.

" *Witnesseth*, that the said party of the first part, for the consideration hereinafter mentioned, agrees with the party of the second part to perform in a faithful manner the following: To print in the directory of their subscriber's book, the name, business and address of the party of the second part. To deliver at the homes of the people of Washington, 100,000 copies of said books, soliciting their trade, and to instruct and to explain them how they are to use the same, and keep a correct list of the names and addresses of all persons to whom same are delivered; and in every way to use their best endeavor to promote the business interest and trade of the party of the second part. And the party of the second part agrees with the party of the first part, in consideration of the faithful performance of the foregoing, to receive from the party of the first part a sufficient amount of trading stamps to supply all persons who may call for them. The stamps to be given out as follows: one stamp to be given for each and every ten cents represented in a purchase; ten stamps for one dollar, etc., the stamps to be given when the purchases are paid for. To pay party of the first part fifty cents per hundred for all stamps thus used. To make weekly settlements for each page used or given out. And party of the second part further agrees, not to sell any stamps, and to give them only to parties purchasing goods from their store. To co-operate in every way possible with party of the first part to promote the best interest of all the merchants named in the book. To

display 'We give trading stamps,' in a conspicuous place in their store.

"The parties of the first and second part mutually agree that this agreement shall remain in force for one year from above date."

On the back of said contract is the following indorsement: "Excludes all other dry goods and department stores in Washington, D. C., except those now engaged in our plan."

The book referred to in the contract, 100,000 copies of which were to be distributed among the residents of Washington, is a small pamphlet of some forty pages, in a green paper cover bearing the imprint of copyright secured. It bears the title, "Trading Stamp Book," in large letters on the first page of the cover, over a *fac simile* of the green stamp proposed to be used.

The first three pages contain the following printed words under the titles of "Explanation" and "Notice to Stamp Collectors":

## EXPLANATION.

The Trading Stamp Company has established a permanent business in your city.

The object of this syndicate of merchants is to mutually benefit the buyer and the seller.

To this end, we have contracted with the leading merchants of your city, so, if you trade with these merchants and collect stamps, you will be able to obtain beautiful and useful premiums, absolutely free of any expense to yourself.

You will find, commencing on page 3 of this book, a directory of the merchants who give trading stamps.

These merchants give you a trading stamp for each and every ten cents' worth of cash goods you buy. For example, if you buy ten cents' worth of groceries, you will receive one trading stamp; if your bill amounts to $1.00, you will receive ten trading stamps, etc.

You will only receive stamps for the multiple of ten that

is in your purchase. For instance, if your bill is twenty-five cents, you will only receive two stamps, etc.

Stick the stamps on the figures on the pages in this book. When you have filled the book, you are entitled to your choice of over one thousand premiums, constantly kept in stock at our store, No. 423 Seventh Street N. W., a few of which are mentioned in the back of the book. Call at our store and see complete stock.

Ask for trading stamps. As a rule, merchants do not give them unless called for.

The syndicate of merchants whose names appear in the accompanying lists, and who represent the leading and enterprising business men of their lines in the city, are anxious to secure new cash customers, and thus increase their trade, by giving trading stamps. And when received by the customer from the several merchants with whom he trades, to the amount of $99.00 or more, from any or all the stores combined, will be exchanged for the customer's choice of a large variety of magnificent premiums carried in stock by The Trading Stamp Company, consisting of richest designs in quadruple-plated silverware, books, pictures, clocks, lamps, furniture, bicycles, opera glasses, cameras, musical instruments, gold rings, etc.

It is a strictly "up-to-date" idea, being operated by a syndicate of "up-to-date" merchants, who through it are making a notable effort to secure the trade of an "up-to-date people.

*Bear in mind*, the merchants will make no advance in the prices of their goods, but, on the contrary, the increase of trade by this new plan will enable them to sell closer than ever before.

If you do not care to take advantage of these privileges yourself, give some deserving person the benefit, or turn the stamps over to your children or servants.

*Be sure to ask for trading stamps.* As this plan is new to the merchants, they may unintentionally neglect to give

you stamps. The remedy lies with the customer. You should not hesitate to ask for trading stamps from any merchant in the directory.

#### NOTICE TO STAMP COLLECTORS.

Trading stamps make business hum, increase merchants' trade, and bring in the cash. For this reason you need not hesitate to ask for stamps. Merchants will not force stamps upon you. Ask for them.

If you trade only with merchants who can supply you with stamps your book will soon be full. Remember, you can obtain stamps for any article you may wish to buy.

When merchants give you the stamps willingly, you will know they are anxious to please you and secure your patronage. Tell your merchant you are trading with him because he gives stamps.

The great advantage of *this* system is that you do not have to carry your book with you when shopping; simply ask for stamps. Do not lose them, but take them home and paste them in your book.

Should any merchant whose name is in our directory not treat you courteously or refuse to give you trading stamps, he is unworthy your patronage, having broken his contract with us, and you will do us a great favor by reporting the matter to us.

The foregoing are followed by a list containing several hundred names of merchants, with the nature of their business, alphabetically arranged, and their respective locations by street and number under the following title: "Directory of leading enterprising merchants who give trading stamps." Thirty-three pages follow, each ruled so as to show thirty squares within which the stamps are to be pasted according to minute directions given.

The last two pages of the cover contain a list of part of the "over a thousand very attractive, valuable and useful premiums to select from," with the information that "these

can be secured free," and further that "we are constantly adding new premiums to our stock."

The gifts or premiums are kept for exhibition and delivery at the store or wareroom of the Stamp Company.    No gift or present is made except upon the presentation of one of the books aforesaid filled with stamps to the number of 990.    Only one of the exhibited articles (to be selected by the holder of the book) will be delivered upon the surrender of each book; but special notice is given that a $100 bicycle will be exchanged for seven books, and a sewing machine for five.

It is indicated by the endorsement on the contract and admitted on the argument, that the Trading Stamp Company limits its benefits to a particular number of dealers in each line of business carried on in Washington, whose names appear in the directory aforesaid.

*Mr. A. S. Worthington* for the plaintiff in error : ·

1. Reasonably construed, section 1177 applies only to gift enterprises in which the distribution of gifts or prizes is in some way regulated by lot or chance.    The trading-stamp business as carried on by the defendants contains no element of chance.    Every customer of the stores engaged in the business who pays cash for what he purchases is entitled to demand and receive stamps to the extent of one stamp for every ten cents' worth purchased, and every such customer when he has accumulated nine hundred and ninety of the stamps is entitled to demand of the Trading Company at its stores that they be exchanged for such articles as he may select.    Every customer whose purchases amount to ten cents or more is entitled to the benefit of the discount, and the discount is the same to everybody.    This prosecution therefore can not be sustained, unless it be determined that Congress has undertaken to prohibit every person who has anything to sell from offering a gift or discount to anybody who will buy that thing.

So far as we have been able to find, every case sustaining a prosecution under anti-lottery or anti-gift enterprise statutes has been a case in which the defendant had either distributed prizes among persons chosen by lot or chance or had distributed to all his customers prizes of unequal value, the person who was to receive each prize being determined by lot or chance. Rarely, indeed, has any prosecution been ever attempted where, as in this case, the element of chance is entirely eliminated, and in every such instance the courts have acquitted the defendants, either because the law was void or because, properly construed, the defendant had not violated it. *People* v. *Gillson*, 109 N. Y. 395, 399; *Long* v. *State*, 73 Md. 527; S. C., 74 Md. 565; *Yellow Stone Kit* v. *State*, 88 Ala. 196; *State* v. *Randle*, 41 Tex. 292; S. C., 42 Tex. 580.

It may be contended that the language of section 1177 is so broad that it can not reasonably be restricted in its application to immoral gift enterprises. The language used is, indeed, exceedingly general. The definition of "gift enterprise," as contained in the act of the Legislative Assembly, was very comprehensive, and the act of 1873, as carried into sections 1176 and 1177, makes it unlawful to engage in a gift-enterprise business in the manner defined by the Legislative Assembly "or otherwise." The Legislative Assembly was providing for the licensing of gift enterprises. Its object was to include everything that might possibly go by that name so as to enhance the revenues of the District. A liberal construction would be applied in such a case. The purpose of Congress, on the contrary, it must be supposed, was to protect the morals of the community—to prevent a species of gambling. Hence a different rule must be applied in construing the act of Congress. Many cases might be referred to in which language as broad as this has been narrowed by construction so as to apply only to what was obviously within the intent of the law-making power. *In re* Chapman, 166 U. S. 661, 667, *United States* v. *Kirby*, 7 Wall. 482.

In this and other like cases in the State courts the decisions rest either upon section 1 of the fourteenth amendment to the Constitution of the United States, which provides that no State shall "deprive any person of life, liberty, or property without due process of law," or upon provisions of the State constitutions which contain similar language. The fifth amendment to the Constitution of the United States contains such a prohibition, which is binding upon the United States. The provision of the fourteenth amendment above referred to was required simply because it had been held that the fifth amendment (and all the other amendments from the first to the tenth, inclusive) bound the general government and not the individual States. *Barron* v. *Mayor*, 7 Pet. 243, 247; *Thorington* v. *Montgomery*, 147 U. S. 492.

The opinion in *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589, shows that the Supreme Court has always held that such an interference with the use of property as section 1177 contemplates, if it is to be construed as applying to gift enterprises involving no immoral feature, deprives the citizen of his "liberty" as that word is used in the fifth and fourteenth amendments to the Constitution. See also *Rwy. Co.* v. *Minnesota*, 134 U. S. 418; *Boyd* v. *United States*, 116 U. S. 616; *Counselman* v. *Hitchcock*, 142 U. S. 547.

Section 1177, if construed as insisted upon by the counsel for the District of Columbia, must be held void in so far as it applies to such enterprises as that in which these defendants are shown to have engaged. It was held by this court in *Chapman* v. *United States*, 5 App. D. C. 131, that where an act of Congress is so broad as to cover both constitutional and unconstitutional provisions it may be held void when it is undertaken to apply it to those cases which are beyond the power of Congress and valid as to those transactions with which Congress had the right to interfere.

*Mr. S. T. Thomas*, Attorney for the District of Columbia,

and *Mr. A. B. Duvall*, Assistant Attorney, for the defendant in error :

1. The trading stamp scheme is not only a gift enterprise but it is a species of lottery. "A gift enterprise, in common parlance a scheme for the division or distribution of certain articles of property, to be determined by chance, among those who have taken shares in the scheme." Anderson's Dictionary of Law, 488. "A scheme for the division or distribution of certain articles of property, to be determined by chance, among those who have taken shares in the scheme. The phrase has attained such a notoriety as to justify a court in taking judicial notice of what is meant and understood by it." Black's Law Dictionary, 539. A lottery has been adjudged to be a scheme "for the distribution of prizes by chance." This definition is adopted by the Supreme Court of the United States, in *Horner* v. *United States*, 147 U. S. 449. The attention of the court is called to this case where the court reviews a number of cases in which schemes similar to that developed by the case at bar are held to be lottery schemes. *Dunn* v. *People*, 40 Ill. 465; *Davenport* v. *Ottawa*, 54 Kans. 711; *Bell* v. *State*, 5 Sneed, 507; *United States* v. *Wallis*, 58 Fed Rep. 942; *Hudelstone* v. *State*, 91 Ind. 426; *Taylor* v. *Smetten*, 11 Q. B. Div. 267.

2. The act of Congress prohibiting gift enterprises is constitutional. This question does not arise if the scheme of the trading stamp company amounts to a gift enterprise or a lottery, since Congress has unquestionably authority to legislate on that subject.

3. Section 1177 of the Revised Statutes of the District of Columbia is a valid exercise of the police power. *Munn* v. *Illinois*, 94 U. S. 113; *Barbier* v. *Connolly*, 113 U. S. 27.

4. The act of Congress of February 17, 1873, prohibiting gift enterprises is a valid and efficacious exercise of legislative power. The act does not single out particular individuals and subject them to special burdens nor does it do so as to some of those engaged in a particular business, as for

instance the Chinese in the laundry business, which the Supreme Court of the United States condemned in the case of *Son Ming* v. *Crawley*, 113 U. S. 703. But it subjects all in this particular business to its provisions just as a law relative to the banks and the conduct of banking would subject all in that particular business to its terms. Legislation of like character is to be found upon the statute books of every State. *Vault Co.* v. *Railroad Co.*, 17 S. W. Rep. 567; *Railway Co.* v. *Mackey*, 127 U. S. 205; *Railway Co.* v. *Beckwith*, 129 U. S. 2. The general power of the legislature to regulate occupations and business of, all kinds, keeping within the principle that all members of a particular class proposed to be regulated must be equally amenable to the regulations made, has been declared time and again.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. It is not denied that the power of Congress to legislate in respect of matters affecting the public health, safety, peace and morals within the District of Columbia, is the same as that of the State legislatures within their several jurisdictions. It is neither greater nor less; for "all of the guarantees of the Constitution respecting life, liberty and property are equally for the benefit of all citizens of the United States residing permanently or temporarily in the District of Columbia, as of those residing in the several States of the Union." *Kerr* v. *Ross*, 5 App. D. C. 241, 247, 248; *Callan* v. *Wilson*, 127 U. S. 640.

The general nature of the police power of the State is nowhere more forcefully stated than in the eloquent words of Mr. Justice Field. He says: "It is undoubtedly true that it is the right of every citizen of the United States to pursue any lawful trade or business, under such restrictions as are imposed upon all persons of the same age, sex and condition. But the possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety,

health, peace, good order and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same rights by others. It is then liberty regulated by law. The right to acquire, enjoy, and dispose of property is declared in the constitutions of the several States to be one of the inalienable rights of man. But this declaration is not held to preclude the legislature of any State from passing laws respecting the acquisition, enjoyment and disposition of property, what contracts respecting its acquisition and disposition shall be valid, and what void or voidable; when they shall be in writing and when they may be made orally; and by what instruments it may be conveyed or mortgaged, are subjects of constant legislation. And as to the enjoyment of property, the rule is general that it must be accompanied with such limitations as will not impair the equal enjoyment by others of their property. *Sic utere tuo ut alienum non laedas* is a maxim of universal application. For the pursuit of any lawful trade or business the law imposes similar conditions. Regulations respecting them are almost infinite, varying with the nature of the business." *Crowley* v. *Christensen*, 137 U. S. 89.

Speaking for the same court, some years before, Chief Justice Waite said: "Many attempts have been made in this court and elsewhere to define the police power, but never with entire success. It is always easier to determine whether a particular case comes within the general scope of the power, than to give an abstract definition of the power itself which will be in all respects accurate. No one denies, however, that it extends to all matters affecting the public health or the public morals." *Stone* v. *Mississippi*, 101 U. S. 818.

In a case involving the regulation of the trade of plumbing in the District of Columbia, we had occasion to say: "It is not an easy matter to draw the line beyond which this

power of regulation of trades and business may not be extended, in the interest of the public health and safety, without becoming an unwarranted invasion of private right. Each case must depend upon its own peculiar circumstances and conditions. Whilst much is left to the discretion of the legislature and its exercise thereof will not be lightly disturbed, yet the final question whether the trade or calling is of such a nature as to justify police regulation, and when conceded to be such the length to which such legislation may be rightfully extended, is unquestionably to be finally determined by the courts." *Kerr* v. *Ross*, 5 App. D. C. 249.

In matters of this nature, the discretion of the legislature is very large, and every fair presumption is to be indulged in favor of power as exercised. *Powell* v. *Pennsylvania*, 127 U. S. 678, 684, 685.

It is only, therefore, in a case where the statute purporting to have been enacted for the protection of the public health, safety, peace, and morals "has no real or substantial relation to those objects, or is a palpable invasion of the rights secured by the fundamental law," that the courts will declare it void. *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Yick Wo* v. *Hopkins*, 118 U. S. 356, 373; *Powell* v. *Pennsylvania*, 127 U. S. 678, 684; *City of Baltimore* v. *Radecke*, 49 Md. 217.

2. In the light of the doctrines above enounced, it remains to consider the nature and scope of the statute under which the information in this case was presented, with the objections thereto, in application to the facts hereinabove set forth.

Now, whilst the information charges the defendants with the offence, in general terms, of engaging in a "gift enterprise" we are, nevertheless, spared the consideration and determination of the common or technical meaning of that phrase because the act of Congress under which the prosecution is maintained itself undertakes to define the character of acts comprehended therein.

With a view to raising revenue from this and other

sources, the Legislative Assembly of the District of Columbia on August 23, 1871, passed an act, the 25th section of which (said to have been copied from a revenue act of Congress then in force) reads as follows:

"The proprietors of gift enterprises shall pay one thousand dollars annually. Every person who shall sell or offer for sale any real estate or article of merchandise of any description whatever, or any ticket of admission to any exhibition or performance, or other place of amusement, with a promise, expressed or implied, to give or bestow, or in any manner hold out the promise of gift or bestowal, of any article or thing, for and in consideration of the purchase by any person of any other article or thing, whether the object shall be for individual gain or for the benefit of any institution of whatever character, or for any purpose whatever, shall be regarded as a gift enterprise: *Provided,* That no such proprietor, in consequence of being thus taxed, shall be exempt from paying any other tax imposed by law, and the license herein required shall be in addition thereto." (Laws of the District of Columbia, 1871–'72, part II, pp. 96, 97.)

After less than two years' experience of license there came a complete revolution of public policy as declared by Congress. That which had been permitted and made a source of revenue was then prohibited as an offence. On February 17, 1873, an act was passed entitled "An act prohibiting gift enterprises in the District of Columbia," 17 Stat. 464. This was embodied in the Revised Statutes for the District of Columbia becoming Sections 1176 and 1777 thereof, as follows:

"SEC. 1176. So much of the act of the Legislative Assembly of the District of Columbia entitled 'An act imposing a license on trades, business and professions practiced or carried on in the District of Columbia,' approved August twenty-third, eighteen hundred and seventy-one, as authorizes gift enterprises therein, and licenses to be issued therefor, is disapproved and repealed, and hereafter it shall be

unlawful for any person or persons to engage in said business in any manner as defined in said act or otherwise.

"Sec. 1177. Every person who shall in any manner engage in any gift enterprise business in the District shall, on conviction thereof in the Police Court, on information filed for and on behalf of the District, pay a fine not exceeding one thousand dollars or be imprisoned in the District jail not less than one nor more than six months, or both, in the discretion of the court."

3. The first contention on behalf of the plaintiffs in error, in respect of the operation of the above statute, is that it is so general in its scope as, necessarily, to comprehend, and undertake to punish as offences, acts that are matters of common, private right clearly beyond the power of Congress to prohibit or to interfere with in any manner, under the guarantees of the Constitution; and that this forbidden purpose and operation are inseparable, save by construction only, from the operation upon those acts which, with equal clearness, are within the power to prohibit and punish.

It is argued, therefore, that the forbidden operation being inseparable from that which is permissible, the whole act must be declared void in accordance with the doctrine of the Supreme Court of the United States in the following cases: *United States* v. *Reese*, 92 U. S. 214, 221; *Trademark Cases*, 100 U. S. 82, 95; *United States* v. *Harris*, 106 U. S. 629; *Baldwin* v. *Franks*, 120 U. S. 678, 685. With the exception of the *Trademark Cases*, those were all cases of criminal prosecutions under sections of the Revised Statutes relating to conspiracies to deprive citizens of the United States of certain legal rights, etc., and it was plain that Congress had exercised powers not conferred by the Constitution and its amendments, and thereunder had undertaken to punish, as offences against the authority of the United States, acts which, in general, were cognizable in the State courts only as crimes against the State. The court declined to limit the sections by construction, so as to make them embrace those acts only

that would, when committed under certain conditions, come within the Federal jurisdiction. To do so, it would have had, as was said in *Reese* v. *United States*, 92 U. S., p. 221, "to introduce words of limitation into a penal statute;" and as was said later in *Trademark Cases*, 100 U. S., p. 98, "it is not within the judicial province to give to the words used by Congress a narrower meaning than they are manifestly intended to bear, in order that crimes may be punished which are not described in language that brings them within the constitutional power of that body."

In the case at bar, there is no question of conflicting State and Federal jurisdictions, or of constitutional prohibition of any interference whatsoever in the subject-matter of legislation; but merely a question as to the degree or length to which an acknowledged power may be extended.

We think, therefore, that this case must fall within another rule of statutory construction equally well established as the former. Sections 102 and 103, Revised Statutes, providing a punishment for witnesses who refuse to answer questions propounded in the course of an investigation instituted by Congress, afford an example.

In a case arising under those sections it was said by the Chief Justice in delivering the opinion of this court:

"It has been strongly urged in argument that the terms of the section, 102, are sufficiently broad and comprehensive to include a class of witnesses protected and exempted by the provisions of Article V of the Constitution, and especially so when read, as urged it should be, in connection with the next succeeding section, 103, of the Revised Statutes; and therefore the section is void *in toto*. But it is not pretended that the appellant belongs to the class of witnesses contemplated by the article of the Constitution referred to; and if the contention of the appellant were conceded to be correct, as applied to a class of witnesses under different conditions, it would not follow necessarily that the statute should be stricken down in its entirety, because it may be susceptible

of an unconstitutional application in certain cases that may possibly arise. This is not reasonable, nor is it in accordance with the rule of interpretation adopted by the Supreme Court of the United States, as applied to a statute good on its face, but where, by reason of its general and comprehensive terms, it may be made, by construction, to apply to objects forbidden by the Constitution. In such case the statute will be allowed its full force and operation, as applicable to all cases, rightfully and constitutionally within its provisions, but such application will be restrained as to those objects simply to which the statute is forbidden to extend. This is the rule, as we understand it, upon which the Supreme Court acted in the *State Freight Tax Case,* 15 Wall. 232; *Supervisors* v. *Stanley,* 105 U. S. 305, 313; *Virginia Coupon Cases,* 114 U. S. 269, and other cases that could be cited." *Chapman* v. *United States,* 5 App. D. C. 122, 131; see also *In re Chapman,* 166 U. S. 667.

The comprehensive scope of the police power, as exercised in our day and under our form of constitutional government, has been developed by the process of evolution. Rapid increase in population, wonderful inventions, from time to time, followed by vast material development and advances in the arts of civilization, have introduced novel situations and begotten difficulties for the solution of one generation, that were unanticipated and often undreamed of even by the most advanced minds of the generation next preceding. As a necessary consequence, the boundaries of the police power in its application to the property, business and personal liberty of the individual citizen have never been definitely settled so as to furnish a certain guide for all cases as they may present themselves for legislative or judicial determination. Hence, as we have seen above, in the quotation from the opinion of Chief Justice Waite, the want of success of the many attempts " to give an abstract definition of the power itself which will be in all respects accurate." Whilst the existence, or the absence, of power

in the legislature to regulate, or to prohibit, is, in many instances, perfectly plain, there is a border line between the two, the accurate delimitation of which presents the difficulty. Special circumstances, under new or different conditions, give rise to new applications that must remain uncertain until settled by judicial determination in an actual case. If strict accuracy of definition and certainty of application be required in each exercise of the power by the legislature, so as to prevent the inclusion by possible construction, of something not within that power, there would be few laws creating new offences in response to newly-developed public needs, that would escape condemnation.

It is the duty of the courts to take a liberal view of the situation presented to the legislature in such cases, and to give its acts providing therefor "a sensible construction such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion." *Law Ow Bew* v. *United States,* 144 U. S. 47, 59 ; *In re Chapman,* 166 U. S. 667.

4. We do not feel called upon at this time to undertake a specification of the particular conditions in which the act under consideration might or might not apply to actual merchants in the ordinary course and practice of competitive business, or to determine just what character of inducements by way of gift or premium may, and may not, be held out to purchasers at the time, and as a part of their purchases. That it was not intended to apply to ordinary discounts for cash, or in proportion to amounts of purchases when made by the merchant himself to his customers, may be regarded as certain ; and the exercise of such power would doubtless be denied if expressly attempted. Nor can it with reason be said to apply to *bona fide* co-operative associations and the like. It is possible also that it might not be operative in a case where the sale of a lawful article is accompanied by a gift of something specific and certain,

not attended with any element of chance, and where the gift is not the real object of the sale, in an attempt to evade acts regulating or prohibiting a particular traffic, as, for example, in the case of *Lauer* v. *The District of Columbia* (recently decided), *ante,* p. 453.

Some cases have been cited by counsel wherein such sales were either held not to be embraced in the statute, or, if comprehended, to render it void. The statutes involved were not, in all respects, like ours, but it is unnecessary to point out the differences, in the view that we take of the application of those cases to the grounds of decision in this case.

(1) *Yellowstone Kit* v. *The State,* 88 Ala. 196; S. C. 7 L. R. A. 599. In that case the defendant made a free gift of tickets entitling the holders to chances in a limited distribution of prizes as a means whereby to gather a crowd to whom he offered patent medicines for sale. The distribution of the tickets and the prizes had no connection with the sales and prices of the medicines; and the court held that the act did not constitute a lottery within the meaning of the statute, because there was no consideration demanded or received for the tickets.

(2) *Long* v. *State,* 74 Md. 565. In that case the Court of Appeals of Maryland reconsidered the conclusion reached on a former appeal (73 Md. 527), and declared the statute void because of its unwarranted interference with the liberty of the citizen. Long was a coffee dealer, and in order to induce customers gave with each package of coffee sold a ticket entitling the purchaser to select a cup and saucer or a plate from a number displayed on a table for examination by intending purchasers.

(3) *People* v. *Gillson,* 109 N. Y. 395. The facts of that case were substantially the same as those in the case of *Long* v. *The State, supra,* and the statute which made it a crime for a merchant, in selling any article of food, to promise to give the purchaser something else in addition to

11 Ct. App.—35

the article sold, as a prize or reward for making the purchase, was denounced in vigorous terms and declared void.

(4) *Commonwealth* v. *Emerson*, 165 Mass. 146. There the statute declared that "no person shall sell, exchange or dispose of any property, or offer or attempt to do so upon any representation, advertisement, notice or inducement that anything other than what is specifically stated to be the subject of the sale or exchange, is, or is to be, delivered or received, or in any way connected with or a part of the transaction." The defendant was a retail tobacco dealer. He displayed in his window a great number of photographs of distinguished people, and each purchaser of a package of tobacco was permitted to select one of the photographs without further consideration. Nothing was said in respect of the invalidity of such a statute; but the court held that the transaction was not within its prohibition, saying that the terms of the statute "were not intended and do not purport to forbid a sale of two things at once, even if one of them is the principal object of desire and the other an additional inducement which turns the scale."

Without approving or disapproving the foregoing decisions, and reserving our opinion in respect of the application of our statute to the facts involved therein until such time as a case may be presented demanding it, we can pass them by as having no necessary bearing upon the case of these plaintiffs in error.

In like manner, we think this case may be decided without reference to the numerous decisions cited by counsel for the District, in each of which the element of chance in the distribution of gifts and prizes was the controlling fact.

Without the necessity of declaring that the acts proved in this case constitute the conduct of a lottery or gift enterprise, as those words are commonly understood, or even of finding that the element of chance operates intentionally and distinctively in the scheme of the Trading Stamp Company, we think, nevertheless, that they come within the

prohibition of the statute, which, as before said, furnishes its own definition of "gift enterprise."

Although one of the most shrewdly planned of the many devices to obtain something for nothing, and one apparently entirely novel, it could hardly have come more clearly within the scope of the statute had it been well known and expressly in the contemplation of Congress at the time of the enactment.

The Washington Trading Stamp Company and its agents are not merchants engaged in business as that term is commonly understood. They are not dealers in ordinary merchandise, engaged in a legitimate attempt to obtain purchasers for their goods by offering fair and lawful inducements to trade. Their business is the exploitation of nothing more or less than a cunning device.

With no stock in trade but that device and the necessary books and stamps and so-called premiums with which to operate it successfully, they have intervened in the legitimate business carried on in the District of Columbia between seller and buyer, not for the advantage of either, but to prey upon both. They sell nothing to the person to whom they furnish the premiums. They pretend simply to act for his benefit and advantage by forcing their stamps upon a perhaps unwilling merchant who pays them in cash at the rate of $5 per thousand. The merchant who yields to their persuasion does so partly in the hope of obtaining the customers of another, and partly through fear of losing his own if he declines. Again, a limited number only (an apparently necessary feature of the scheme) are included in the list for the distribution of the stamps, and other merchants and dealers who can not enter must run the risk of losing their trade or else devise some other scheme to counteract the adverse agency.

The stamps are sold at the rate of fifty cents per hundred to the contracting merchants, and yet purport to be redeemable with premium gifts at the assumed value of one dollar

per hundred. Unless, therefore, the so-called premiums to be distributed among the diligent collectors of stamps are grossly overvalued, the scheme can not maintain itself, for in addition to the actual cost of the premiums it has to bear the cost of the books and stamps and the maintenance of its office and exhibition room.

If its premiums should have any fair value, then the Stamp Company must inevitably rely upon the failure of the presentation of tickets for redemption by reason of its requirement that not less than 990 tickets—representing cash purchases of $99.00—shall be pasted in a book and produced at one time to entitle the holder to his premium. In this event, the company, if it actually contemplates making good its contracts, is relying upon a lottery; that is to say, the chances and advantages of its game for its expectations of profit or gain.

There is not a shadow of rational foundation for the Stamp Company's claim that it confers a benefit upon buyers by procuring for them an actual discount. If its business were continued and its contracts faithfully performed, its inevitable result would be, as in all unnecessary interventions of third persons, or "middle men," between producer and consumer, an increase of cost to the latter.

The prohibition of such a scheme is clearly within the power of Congress, within this District, and the statute under which the prosecution has been maintained makes ample provision for its exercise.

5. The appeal of the defendant Lansburgh must abide the result of his co-defendant's. Their cases are inseparable. Although a regular merchant of the city of Washington, he does not appear on this record as convicted of the offence of offering a discount, a premium or a gift to his own customers upon sales made to them in the course of his business, and he cannot make that defence. By his contract and its attempted performance he made himself the accomplice of the manager of the Washington Trading

Stamp Company—an active party in the promotion of its unlawful scheme; and for that offence alone he has been convicted.

We find no error in the proceedings in the Police Court; and the judgment must be affirmed, with costs.

*Affirmed.*