# DISTRICT OF COLUMBIA *v.* KRAFT.*

---

GIFT ENTERPRISES; CONSTITUTIONAL LAW; CRIMINAL LAW.

1. An enterprise is not a bona fide co-operative association, but is a gift enterprise, as defined by the act of the late legislative assembly of this District, of August 23, 1871, and as prohibited by D. C. Rev. Stat. secs. 1176 and 1177, where it consists of a corporation with a capital stock held exclusively by its officers and directors, but having so-called members, each of whom pays annually a fee of 25 cents

---

*As to forbidding use of trading stamps, see note to *Ex parte Drexel*, 2 L.R.A.(N.S.) 588.

for the right to receive trading stamps on his purchases from merchants, the names of whom the corporation publishes, under contract, in its directory of merchants who will deliver stamps with purchases, and to whom it sells stamps for $3.50 per 1,000 stamps, the stamps having a redemption value of $2 per 1,000, thus realizing to the corporation a profit of $1.50 per 1,000, no part of which profit is received by the members, who, however, receive back each year the membership fees, less the cost of obtaining new members, and have the privilege of redeeming their stamps at the offices of the corporation in cash or goods at the rate of $2 per 1,000, in any quantity not less than five.  Mr. Justice Van Orsdel dissenting.  (Following *Lansburgh* v. *District of Columbia*, 11 App. D. C. 512.)

2. Cases adjudged in courts of other jurisdictions relating to gift enterprises, *classified, considered,* and *distinguished*.

3. The police power of Congress in the District of Columbia, is substantially the same under the 5th Amendment of the Federal Constitution as that which may be exercised by the States under the limitations of the 14th Amendment.

4. Secs. 1176 and 1177, D. C. Rev. Stat., making it a criminal offense to engage in this District in the business of conducting a gift enterprise, as defined in the act of the late legislative assembly of this District, of August 23, 1871, is constitutional.  (Reconsidering and reaffirming *Lansburgh* v. *District of Columbia*, supra.)

No. 2118.  Submitted April 11, 1910.  Decided May 10, 1910.

In ERROR to the Police Court of the District of Columbia.
                                        *Judgment reversed.*

The COURT in the opinion stated the facts as follows:

The defendant in error, William B. Kraft, was charged by information in the police court with engaging in a gift enterprise in violation of an act of Congress.  He moved to quash the information on the following grounds:  First, it does not set forth an offense against any law or regulation; second, so far as the act attempts to prohibit the acts charged, it is unconstitutional.

The motion was sustained, and a writ of error applied for by the District of Columbia has been granted.

The business in which Kraft was engaged is that of issuing

and redeeming what are called "trading stamps," in the same general manner described in the report of the case of *Lansburgh v. District of Columbia,* 11 App. D. C. 512, decided December 7th, 1897. Lansburgh, a retail merchant of the District, and Joseph A. Sperry, managing officer of a trading stamp company, a corporation of New York, were jointly charged with engaging in a gift enterprise, in violation of the same statute under which Kraft has been prosecuted. On August 23d, 1871, the then legislative assembly of the District made the following enactment:

"The proprietors of gift enterprises shall pay one thousand dollars ($1,000) annually. Every person who shall sell or offer for sale any real estate, or article of merchandise of any description whatever, or any ticket of admission to any exhibition or performance, or other place of amusement, with the promise, expressed or implied, to give or bestow, or in any manner hold out the promise of gift or bestowal of, any article or thing, for and in consideration of the purchase by any person of an article or thing, whether the object shall be for individual gain, or for the benefit of any institution of whatever character, or for any purpose whatever, shall be regarded as a gift enterprise: Provided, that no such proprietor, in consequence of being thus taxed, shall be exempt from paying any other taxes imposed by law, and the license herein required shall be in addition thereto."

After less than two years of experience of license, Congress, on February 17th, 1873, repealed the license clause of the aforesaid enactment, and prohibited the business under a penalty. (17 Stat. at L. 464, chap. 148). Subsequently, said act was embodied in the Revised Statutes of the District of Columbia in secs. 1176 and 1177 thereof. These read as follows:

"Sec. 1176. So much of the act of the legislative assembly of the District of Columbia entitled 'An Act Imposing a License, on Trades, Business, and Professions Practised or Carried on in the District of Columbia,' approved August 23d, 1871, as authorizes gift enterprises therein, and licenses to be issued therefor, is disapproved and repealed, and hereafter it

shall be unlawful for any person or persons to engage in said business in any manner, as defined in said act or otherwise."

"Sec. 1177. Every person who shall in any manner engage in any gift enterprise business in the District shall, on conviction thereof in the police court on information filed for and on behalf of the District, pay a fine not exceeding one thousand dollars ($1,000), or be imprisoned in the District jail not less than one nor more than six months, or both, in the discretion of the court."

In *Lansburgh* v. *District of Columbia, supra,* it was held: 1. That this statute was within the police power of Congress, under its exclusive jurisdiction over the District of Columbia. 2. That it was not too broad in its scope of inclusion of prohibited acts to constitute a valid exercise of the power of Congress. 3. That the acts charged constituted engaging in the business of a gift enterprise, within the meaning of secs. 1176 and 1177, D. C. Rev. Stat. In respect of this last conclusion, it was said (p. 530): "Without the necessity of declaring that the acts proved in this case constitute the conduct of a lottery or gift enterprise, as those words are commonly understood, or even of finding that the element of chance operates intentionally and distinctively in the scheme of the trading stamp company, we think, nevertheless, that they come within the prohibition of the statute, which, as before said, furnishes its own definition of 'gift enterprise.' Although one of the most shrewdly planned of the many devices to obtain something for nothing, and one entirely novel, it could hardly have come more clearly within the scope of the statute had it been well known and expressly in the contemplation of Congress at the time of the enactment."

The scheme denounced in that case was substantially this: The trading stamp company entered into a contract with a retail dealer in merchandise to print in the directory of their subscribers' book the name, business, and address of the merchant; to distribute 100,000 copies of said book to the people of Washington, and to explain the use of the same; the merchant to take from the company sufficient stamps to supply all demands.

for the same, to issue one to the purchaser for each 10 cents' worth purchased, and to display the sign, "We give trading stamps," in a conspicuous place in his store. The merchant was to pay $5 per thousand for said stamps.

Purchasers receiving stamps from the merchant were required to paste the same in places provided in said books. When 990 stamps had been received and entered in a book, the trading stamp company obligated itself to exchange therefor any one of a great variety of articles kept by it on exhibition in a store for the purpose. No articles were kept for sale, but only for exchange for tickets when presented in the manner and to the number aforesaid. No stamps were redeemed in cash, or in quantity less than 990.

The first contention of Kraft is that his business is different from that described above, by reason of which differences he is not within the inclusion of the decision in that case.

The differences alleged are these: (1) Kraft's company is a co-operative association; (2) stamps are redeemable at the option of the purchasing member of the association, in cash at the rate of 10 cents for five; five bringing 1 cent.

The agreed statement of facts shows that David Rothschild, Wallace J. Hill, and William B. Kraft obtained a charter in the State of Virginia, under the name of the Economy Co-operative Society, authorizing them to engage in said business. The authorized capital stock was $10,000, divided into 100 shares. The incorporators were named as directors for the first year, and Rothschild was made president, Hill, vice president, and Kraft, secretary and treasurer. These and one Berliner are the only stockholders of the corporation.

The so-called co-operative feature was provided for in the by-laws of the corporation. A co-operative society was to be organized, the corporation officers to be officers thereof. Any person may become a member by paying annually in advance a fee of 25 cents. Members are entitled to receive a discount of a certain per cent on all cash purchases from merchants under contract with the corporation to purchase and distribute the discount vouchers. Members are entitled to exchange discount

vouchers (stamps) for merchandise displayed at the corporation office on the basis of the actual cost price of such merchandise to the corporation. Membership fees shall be kept separate from other income of the corporation, and, on the first Monday of January of each year, a dividend shall be declared and paid to members from any surplus thereof that may remain after payment of expenses necessarily incidental to the procurement of new members "and nothing more." No part of the salaries of officers to be charged to this fund. The fund is to be charged only with commissions paid to agents for procuring new members. Members have no right to dividends received from the sale of vouchers (stamps) to merchants. These go to the stockholders of the corporation only.

The contracting merchants receive the stamps or vouchers from the corporation at the rate of $3.50 per thousand. These are to be issued to members making purchases, who are required to produce their membership cards when demanded. Members only can have the stamps redeemed. One stamp is to be given with each 10 cent purchase. Members are entitled to purchase the displayed articles with their stamps, or to have them redeemed in cash at the office of the corporation "in any quantity from five upward, in actual cash, and at their face value, *viz.,* 2 mills each." As regards the issue of stamp books, directories of contracting merchants, etc., the scheme is of the same general character as that described in the *Lansburgh Case.* The statement of facts further shows that the corporation has been engaged in business since July 10th, 1908. Between that date and October 1, 1909,—8,095,000 discount vouchers, or stamps, have been sold to merchants at $3.50 per thousand. 344,000 have been redeemed in cash, and 5,372,000 in exchange for articles of merchandise on display at the corporation's office. Counsel for Kraft stated on the argument that the charter and by-laws of the corporation had been written "with pen in one hand and the Lansburgh decision in the other," so as to bring the scheme within lines declared therein not to be prohibited by the statute. The part of the opinion referred to reads as follows: "We do not feel called upon at this time to undertake

a specification of the particular conditions in which the act under consideration might or might not apply to actual merchants in the ordinary course and practice of competitive business, or to determine just what character of inducements by way of gift or premium may and may not be held out to purchasers at the time, and as a part of their purchases. That it was not intended to apply to ordinary discounts for cash or in proportion to amounts of purchases, when made by the merchant himself to his customers, may be regarded as certain, and the exercise of such power would doubtless be denied if expressly attempted. Nor can it with reason be said to apply to bona fide co-operative associations and the like. It is possible, also, that it might not be operative in a case where the sale of a lawful article is accompanied by a gift of something specific and certain, not attended with any element of chance, and where the gift is not the real object of the sale, in an attempt to evade acts regulating or prohibiting a particular traffic, as, for example, in the case of *Lauer* v. *District of Columbia,* 11 App. D. C. 453."

Mr. *Edward H. Thomas,* Corporation Counsel, and Mr. *William Henry White,* Assistant, for the plaintiff in error.

Mr. *Frank J. Hogan* for the defendant in error.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

Assuming that the statute does not apply in the case of bona fide co-operative associations, or of merchants making discounts or presenting actual articles directly to their customers, we fail to see that the co-operative association belongs in either class. We will consider, first, the co-operative feature. In a general sense a co-operative society or corporation is one organized on the principle of a joint-stock company, where the members share in the profits in proportion to their contributions, and may or may not obtain a discount on their individual purchases.

This society is clearly not one of that kind. The admitted members pay a fee of 25 cents annually for the privilege of receiving stamps on their purchases,—a privilege which the other corporations whose case has been heard with this extends to all persons without charge. But these members are rigidly excluded from any participation in the profits of the corporation; that goes to its stockholders exclusively. These profits accrue from the sale of stamps to the merchants. A rough estimate of these profits, according to the statement of the stamps sold and redeemed during a little more than one year since the organization of the corporation, shows that they amount to about $12,000. All that a member of this so-called co-operative society gets back is his membership fee, less its proportion of the cost of obtaining members. The only benefit they are supposed to obtain is the redemption price of the stamps received on their several purchases from merchants dealing in the stamps, which benefit is extended, without charge, by other stamp companies, as we have seen, to all purchasers from merchants handling their stamps. This system falls far short of constituting a bona fide co-operative society. The only other substantial difference between this scheme and that declared unlawful in the *Lansburgh Case* is this: In that case there was no redemption of stamps in cash, or in less quantities than 990; in this the stamps sold for $3.50 per thousand are redeemable in cash at the option of the holders at the rate of $2 per thousand, and in any quantity not less than five. This feature makes the scheme more advantageous than the other, but does not differentiate it. In substance they are the same.

A vigorous attack has been made on the act as unconstitutional, because it is an unreasonable interference with the freedom of trade and contract. While that question was decided in the *Lansburgh Case,* we are asked to reconsider it, on the ground that the soundness of that decision has been denied in many cases in other jurisdictions. We have carefully examined those decisions, and find that very few of them go to the extent claimed for them. They may be separated into the following classes: (1) Those in which the statute involved prohibited

lotteries and gift enterprises without defining the acts consti-
tuting the same; and it was held that the giving of trading
stamps was neither a lottery nor a gift enterprise, within the
ordinary meaning of the terms. *State* v. *Shugart,* 138 Ala.
86, 100 Am. St. Rep. 17, 35 So. 28; *Humes* v. *Little Rock,* 138
Fed. 929.

(2) Cases holding that statutes prohibiting merchants from
giving premiums, vouchers, gifts, etc., to purchasers of their
goods, are in excess of legislative power. *State* v. *Dalton,* 22
R. I. 77, 48 L.R.A. 775, 84 Am. St. Rep. 818, 46 Atl. 234;
*People* v. *Gillson,* 109 N. Y. 389, 4 Am. St. Rep. 465, 17 N. E.
343; *State* v. *Dodge,* 76 Vt. 197, 56 Atl. 983, 1 A. & E. Ann.
Cas. 47; *Ex parte Drexel,* 147 Cal. 763, 2 L.R.A.(N.S.) 588,
82 Pac. 429, 3 A. & E. Ann. Cas. 878; *State* v. *Ramseyer,*
73 N. H. 31, 58 Atl. 958, 6 A. & E. Ann. Cas. 445; *Leonard*
v. *Bassindale,* 46 Wash. 301, 89 Pac. 879; *Young* v. *Com.* 101
Va. 853, 45 S. E. 327.

In some of those cases the court went beyond the question
actually involved, and declared that the trading stamp business
of third parties could not be lawfully prohibited. In others,
as in *State* v. *Dalton,* the court expressly limited its decision to
the case of the merchant giving premiums, and declined to
say that the legislature might not prohibit the business of trad-
ing stamp companies.

(3) Cases analogous to those in class 1, which hold that the
statute did not apply to the giving of premiums, simply because
it was limited to those which embraced a gambling feature.
*Com.* v. *Emerson,* 165 Mass. 146, 42 N. E. 559; *Com.* v. *Sis-
son,* 178 Mass. 578, 60 N. E. 385.

(4) Cases in which the statute or municipal ordinance im-
posed a license tax; some holding that the power to license had
not been conferred on the municipality; some that the exercise
of the power in the particular case was unreasonable and op-
pressive; others, that, as applied to a licensed merchant, the
license requirement was inapplicable, because the giving of
premiums by such merchants was but an incident of their regu-
lar business, and not a separate business as such. *Winston* v.

*Beeson,* 135 N. C. 271, 65 L.R.A. 167, 47 S. E. 457; *Hewin* v. *Atlanta,* 121 Ga. 723–729, 67 L.R.A. 795, 49 S. E. 765, 2 A. & E. Ann. Cas. 296; *Ex parte Hutchinson,* 137 Fed. 949, 137 Fed. 950; *Com.* v. *Gibson Co.* 125 Ky. 440, 101 S. W. 385; *Montgomery* v. *Kelly,* 142 Ala. 552, 70 L.R.A. 209, 110 Am. St. Rep. 43, 38 So. 67.

In some of these the courts expressly declined to pass upon the legality of the trading stamp business, which question was not involved. (121 Ga. 729). The case of *O'Keeffe* v. *Somerville,* 190 Mass. 110, 112 Am. St. Rep. 316, 76 N. E. 457, 5 A. & E. Ann. Cas. 684, may be put in this class, but there the license tax was held unconstitutional, because the trading stamps were not "goods, wares, merchandise, or commodities," to which the special taxing power was limited by the Constitution of Massachusetts. See also *State* v. *Walker,* 105 La. 492, 29 So. 973, in which a statute prohibiting trading stamps, etc., was held unconstitutional, because the object of the act was not expressed in the title, as required by a provision of the State Constitution.

(5) Cases of injunction by trading stamp companies against others interfering with their business. *Sperry & H. Co.* v. *Brady,* 134 Fed. 691; *Sperry & H. Co.* v. *Temple,* 137 Fed. 992; *Sperry & H. Co.* v. *Louis Weber & Co.* 161 Fed. 219. No prohibitory statute was involved.

(6) Cases in which the validity of legislation prohibiting the trading stamp business was discussed and involved and expressly denied. *Ex parte Drexel* and *Leonard* v. *Bassindale,* supra; *Denver* v. *Frueauff,* 39 Colo. 20, 7 L.R.A.(N.S.) 1131, 88 Pac. 389, 12 A. & E. Ann. Cas. 521. The California and Washington cases appear to us to involve nothing more than the particular question stated in class 2, supra, and for that reason are ranged thereunder. The general question of the power to prohibit trading stamp concerns, as such, was not necessarily involved. In the Colorado case, the city ordinance went beyond the power conferred by the Constitution and an act of the legislature, which were limited to "lotteries" and "gift enterprises," neither of which terms embraced the giving of trading

stamps as premiums on purchases. This point was the only one necessarily involved, and the case is in fact identical with that of *Winston* v. *Beeson* (Class 4, supra). A recent decision of the supreme court of Minnesota seems to decide the question directly. *State ex rel. Simpson* v. *Sperry & H. Co.* 111 Minn. 378, — L.R.A.(N.S.) —, 126 N. W. 120.

Of the cases cited on behalf of the District of Columbia, but one directly upholds the doctrine of the *Lansburgh Case,* which is quoted from and approved. *Humes* v. *Ft. Smith,* 93 Fed. 857; *State* v. *Hawkins,* 95 Md. 133, 93 Am. St. Rep. 328, 51 Atl. 850, does not involve the direct question presented here.

Before proceeding to consider the question necessarily involved in this case, in the light of some applicable decisions of the Supreme Court of the United States relating to the exercise of the police power limiting the freedom of contract, we will briefly consider a point that has been relied on as showing the legitimate character of the trading stamp business. It has been argued, and in some of the cases cited it has been suggested, that the trading stamp companies are engaged in advertising the merchants contracting with them; and it is contended that this business, in that respect, is similar to that of the ordinary newspaper. Certainly, the right of the advertiser and the newspaper to contract for this purpose has never been questioned. The newspaper is a time-honored institution, indispensable in civilized society. It gives the current news on all subjects of public interest, and in addition opens its pages to advertisers. The merchant purchases his space and presents the advantages of his business. Undoubtedly the cost of this advertising is an expense that must be added to the cost of carrying on the business, and borne along with other incidental expenses. No way can be devised by which the cost of transportation and the legitimate handling of produce or goods in the transfer from producer to consumer can be entirely eliminated.

In the case at bar the advertising feature is a mere pretense; it is of the stamp dealer rather than of the merchant. To induce the purchase of stamps, the stamp company circulates

many copies of its books, which contain a directory of the names and locations of the merchants under contract with it to deliver its stamps with purchases. It is a notice to these persons where they can procure stamps, and where and how they can procure the redemption of the same when obtained. This is of prime importance to the stamp company. The trading stamp concerns are not engaged in the advertising business, or as agents for advertisers. As said in the *Lansburgh Case*, they "are not merchants engaged in business, as that term is commonly understood. They are not dealers in ordinary merchandise, engaged in a legitimate attempt to obtain purchasers for their goods by offering fair and lawful inducements to trade. Their business is the exploitation of nothing more or less than a cunning device. With no stock in trade, but that device and the necessary books and stamps and so-called premiums with which to operate it successfully, they have intervened in the legitimate business carried on in the District of Columbia, between seller and buyer, not for the advantage of either, but to prey upon both. They sell nothing to the person to whom they furnish the premiums. They pretend simply to act for his benefit and advantage by forcing their stamps upon a perhaps unwilling merchant. * * * The merchant who yields to their persuasion does so partly in the hope of obtaining the customers of others, and partly through fear of losing his own, if he declines." We see no reason for withdrawing or qualifying the foregoing observations in the light of the evidence in this case, for, as said before, the businesses are the same, notwithstanding some immaterial differences. It has been argued that there was no evidence to show that the stamps were forced upon perhaps unwilling merchants. That is true, but the courts may take notice of evident conditions and results of trades and business. That merchants are unwilling to enter into the scheme, and regard the same as an unjustifiable imposition, is borne out by the charge made in the same argument that certain merchants of the District had employed counsel who had aided the corporation counsel in the preparation of these cases. This charge would not have been made, if unsupported by the

facts, and it was not denied. The police power of Congress in the District of Columbia, upon the exercise of which this stat- ute rests, is substantially the same under the 5th Amendment as that which may be exercised by the states under the limitations of the 14th Amendment. As was said in the *Lansburgh Case:* "The comprehensive scope of the police power, as exercised in our day, and under our form of constitutional government, has been developed by the process of evolution. Rapid increase in population, wonderful inventions, from time to time, followed by vast material development and advances in the arts of civilization, have introduced novel situations and begotten difficulties for the solution of one generation, that were unanticipated, and often undreamed of even, by the most advanced minds of the generation next preceding. As a necessary consequence, the boundaries of the police power in its application to the property, business, and personal liberty of the individual citizen have never been definitely settled, so as to furnish a certain guide for all cases that may present themselves for legislative or judicial determination." This idea has been better expressed by Macterlinck in "The Life of the Bee," in the form of a fundamental principle of social development. He says: "In proportion as society organizes itself and rises in the scale, so does a shrinkage enter the private life of each one of its members. Where there is progress, it is the result only of a more and more complete sacrifice of the individual to the general interest." See *Otis* v. *Parker,* 187 U. S. 606–609, 47 L. ed. 323–328, 23 Sup. Ct. Rep. 168; *McGuire* v. *Chicago, B. & Q. R. Co.* 131 Iowa, 340–354, — L.R.A.(N.S.) —, 108 N. W. 902.

Hence: "It is always easier to determine whether a particular case comes within the general scope of the power, than to give an abstract definition of the power itself, which will be in all respects accurate." *Stone* v. *Mississippi,* 101 U. S. 818, 25 L. ed. 1079. In a later case it was said: "It is undoubtedly true that it is the right of every citizen of the United States to pursue any lawful trade or business, under such restrictions as are imposed upon all persons of the same age,

sex, and condition. But the possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. \* \* \* The right to acquire, enjoy, and dispose of property is declared in the Constitutions of the several States to be one of the inalienable rights of man. But this declaration is not held to preclude the legislature of any State from passing laws respecting the acquisition, enjoyment, and disposition of property. What contracts respecting its acquisition and disposition shall be valid, and what void or voidable; when they shall be in writing, and when they may be made orally; and by what instruments it may be conveyed or mortgaged,—are subjects of constant legislation. And as to the enjoyment of property, the rule is general that it must be accompanied with such limitations as will not impair the equal enjoyment by others of their property. *Sic utere tuo ut alienum non lædas* is a maxim of universal application. For the pursuit of any lawful trade or business the law imposes similar conditions. Regulations respecting them are almost infinite, varying with the nature of the business." *Crowley* v. *Christensen,* 137 U. S. 86–89, 34 L. ed. 620–623, 11 Sup. Ct. Rep. 13.

That there are bounds to forced individual "shrinkage," in order to prevent its development into sheer arbitrary oppression and tyranny, under our system of government, all must admit. The difficulty lies in the practical ascertainment of those boundaries. The legislature is the judge in the first instance, but when its act is an unmistakable invasion of individual liberty and right, the courts will intervene to arrest its enforcement. In a recent case, a statute of a State was upheld which made it unlawful to screen coal dug by miners before weighing the same for determining their compensation, and prohibiting them from waiving the benefit of the act by contract with the mining company. *McLean* v. *Arkansas,* 211 U. S. 539, 5 L. ed. 315, 29 Sup. Ct. Rep. 206. After referring to *All-*

*geyer* v. *Louisiana,* 165 U. S. 578, 41 L. ed. 832, 17 Sup. Ct. Rep. 427,—a case strongly relied on by the defendant in error, —it was said by Mr. Justice Day, who delivered the opinion of the majority of the court: (p. 545). "But in many cases in this court the right of freedom of contract has been held not to be unlimited in its nature, and when the right to contract or carry on business conflicts with laws declaring the public policy of the State, enacted for the protection of the public health, safety, or welfare, the same may be valid, notwithstanding they have the effect to curtail or limit the freedom of contract. It would extend this opinion beyond reasonable limits to make reference to all the cases in this court in which qualifications of the right of freedom of contract have been applied and enforced." Some of those cases will be mentioned later. He then quotes the following extract from *Gundling* v. *Chicago,* 177 U. S. 183, 44 L. ed. 725, 20 Sup. Ct. Rep. 633: "Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and what such regulations shall be, and to what particular trade, business, or occupation they shall apply, are questions for the State to determine, and their determination comes within the proper exercise of the police power by the State, and unless the regulations are so utterly unreasonable and extravagant in their nature and purpose, that the property and personal rights of the citizen are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the State to pass, and they form no subject for Federal interference." The learned justice then proceeds with the discussion as follows: "It is then the established doctrine of this court that the liberty of contract is not universal, and is subject to restrictions passed by the legislative branch of the government in the exercise of its power to protect the safety, health, and welfare of the people. It is also true that the police power of the State is not unlimited, and is subject to judicial review, and when exerted in an arbitrary or oppressive manner, such laws may be annulled, as violative of rights protected by the Constitution. While the

courts can set aside legislative enactments upon this ground, the principles upon which such interference is warranted are as well settled as is the right of judicial interference itself. The legislature, being familiar with local conditions, is, primarily, the judge of the necessity of such enactments. The mere fact that a court may differ with the legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power." See also *Williams* v. *Arkansas,* April 4th, 1910, 217 U. S. 79, 54 L. ed. 673, 30 Sup. Ct. Rep. 493. One of the cases reviewed in *Mc- .Lean* v. *Arkansas* is not distinguishable in principle from the case at bar. *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13, 46 L. ed. 55, 22 Sup. Ct. Rep. 1. In that it was held that an act of the legislature of Tennessee, requiring the redemption in cash of store orders or other evidences of indebtedness issued by employers in payment of wages due employees, did not conflict with any provision of the Constitution of the United States protecting the right of contract. Had the statute in this case, instead of prohibiting the business, required redemption to be made in cash at the rate of the purchase price of the stamps, it would have been practically identical with the State statute upheld in that case; and yet its effect, by destroying the profits of the trading stamp associations, would necessarily be to put an end to the business.

The whole country is now agitated by the increased cost of living that has grown to alarming proportions, and legislative bodies are inquiring into its causes with a view, if possible, of providing remedies for the mischief. While there is difference of opinion as regards the chief source, all concur in the opinion that every introduction of superfluous middlemen, and consequent unnecessary charges between producer and consumer, undoubtedly contribute to swell the stream to overflowing. Had the statute under consideration been passed at the present session of Congress, it would be regarded as intended to promote the public welfare in this respect. Though enacted many years

ago, when the mischief was not great, it answers the purpose of to-day.

Now, what are the conditions presented by the facts in this case? An entirely unnecessary middleman, for his own profit solely, has injected himself between the regular merchant on the one hand, and his customers on the other. He receives $3.50 for every thousand stamps issued to the customers, and redeems such as may be presented, in goods or in cash at $2 per thousand. By this means the corporation represented by the defendant in error has in the first year of its intervention received about $12,000, which should have either been retained by the merchant or received by his customers.

Several other concerns being engaged in the same business, their profits are probably as great, if not greater. We have then this large sum of money annually taken from the merchant and his customers, and added to the gross cost of living of all of the people of the District, without return. Is it not for the public welfare, in the juridical sense of the term, to prohibit such an undertaking? We think that it is. Must this public welfare be sacrificed to the unlimited freedom of contract invoked in this case, to protect the right to prey upon local commerce? We think not.

With this we will close a discussion that has been carried to an unusual length. Our excuse is the importance of the principle involved, and the great conflict of authority relating to it, which may furnish ground for a writ of certiorari to remove the case to the Supreme Court of the United States, where alone the vexed question may be settled.

It follows that the Police Court erred in sustaining the motion to quash the information, and its judgment must therefore be reversed, with costs, and the cause remanded for further proceedings in conformity with this opinion.          *Reversed.*

Mr. Justice VAN ORSDEL dissenting:

I cannot agree with my associates that the business here under investigation is embraced within the terms of the statute.

I am of opinion that the transaction between the merchant and the customer merely amounts to a discount allowed the purchaser on account of the purchase made. The purchaser receives an order, on presentation of which, according to its terms, he can receive his discount, either in cash or merchandise. Between the merchant and the stamp company, the contract is clearly one for advertising. I agree with what is said by my associates in regard to the ancient and legitimate method of advertising through the medium of the newspaper, but I am unable to distinguish it from many other equally legitimate methods of advertising,—the bill board, the distribution of circulars, the various methods adopted through the different kinds of directories, and the numerous other agencies, all alike conducted and solicited through the agency of third parties intervening between the merchant and his customers. It is true that competition compels the merchant to patronize these agencies, and the public to pay the expense. Deception is at times practised through these methods. It is not apparent, however, from the record before us, that any fraud has been practised or misrepresentation made by the Economy Co-operative Society. The public need not be deceived nor defrauded by this system of discount. The purchaser has his option of taking either cash or merchandise, or refusing both. Neither inconvenience nor delay in securing the discount are in themselves sufficient to bring the transaction within the limitations of the statute.

The system detailed by the record discloses neither a gift enterprise nor a lottery. Every stamp exchanged has a fixed value; and the mere fact that the transaction is conducted through the medium of a third party does not make it different from a direct payment of the discount by the merchant, or the giving of a stamp redeemable by him on presentation. It is conceded that the merchant himself could legally issue the stamps, redeemable by him in cash or merchandise, as an inducement to secure the patronage of the public. Such a transaction would be perfectly legitimate. Exactly the same result is here accomplished. The same discount is paid, and the customer is accorded the same rights. The advertising is conduct-

ed, as is customary, through the medium of a third party. The right of the merchant to so advertise cannot be controverted. With this neither the customer nor the public is concerned. The customer receives the exact inducement offered, an inducement which, so far as the transaction between the merchant and the customer is concerned, is not condemned by the statute. The mere fact that the purchaser is required to take the stamps for redemption to another point in no way affects the legality of the transaction.

In my opinion, the question of the constitutionality of the statute is not before us, as the matter here involved cannot be brought within its provisions. Such statutes are to be strictly construed, and no reasonable construction of this statute can bring the transaction here involved within its provisions. It is unnecessary to discuss in this connection the power of Congress, under the exercise of the police power, to regulate or suppress these stamp enterprises, since that question, in my judgment, is not here presented. The mere fact that the profits of the business have been large, or that a middleman is involved, is not sufficient to bring it by implication within the terms of the statute.

In view of the importance of the question involved, and the wide diversity of opinion among the courts of the country, as to the effect of the statute and the power of the legislature to regulate the business in question, I join with my associates in inviting the allowance of a writ of certiorari by the Supreme Court.

An application by the defendant in error to the Supreme Court of the United States for the allowance of the writ of certiorari, was denied by that court October 24, 1910.