## Moore v. Northern Kentucky Independent Food Dealers Ass'n et al.

March 28, 1941.

26

Ebert, Cook & Burke and Walter J. Burke for appellant.

Frank Lee Dils for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Kentucky's General Assembly at its regular 1936 session enacted chapter 109, page 334, of the session acts for that year, and prescribed that it "shall be known and designated as the 'Unfair Practices Act.'" It appears in Baldwin's 1936 Revision of Carroll's Kentucky Statutes as Sections 4748h-1 to and including 4748h-14. Its first section makes it unlawful for any person, firm or corporation doing business in this state to sell any commodity, product, service or output of service of general use or consumption, including public utilities, from discriminating the prices therefor between different sections, communities or cities, or portions thereof, or any part of them, by a reduction of prices to such communities and localities different from that charged the public generally, when done "with the intent to destroy the competition of any regular established dealer in such commodity, product, or service, or to prevent" or destroy competition in such commercial transactions. However, it exempts from its provisions motion picture films "when delivered and under a lease to motion picture houses." Its provisions also do not apply to selling prices for the purpose of "meeting in good faith of a competitive rate, or to prevent a reasonable classification of service by public utilities for the purpose of establishing rates."

In other words, Section 1—Section 4748h-1 of our Statutes—forbids the acts therein described as discriminatory between *sections, communities* and *localities* in the fixing of sale prices for the commodities named in the act. Section 3 of the act (Section 4748h-3 of our Statutes) prohibits the sale of the same commodities *by retail* to individual customers at prices below the cost to the seller when done "for the purpose of injuring competitors and destroying competition." Section 6 of the act—now Section 4748h-6 of our Statutes—creates certain exemptions from its provisions, but with which we are not concerned in this case. Section 13 of the

act—now Section 4748h-13 of our Statutes—defines the purpose of the act in this language: "The Legislature declares that the purpose of this Act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented. This Act shall be literally [evidently liberally] construed that its beneficial purposes may be subserved." Section 10 of the Act—now Section 4748h-10 of our Statutes supra—extends the remedy of injunction by a properly interested person—natural or corporate—against the offender of the act, to prevent the latter from such violations; whilst other provisions of the act penalize its violators and provide for prosecutions of them.

This equity action was filed in the Kenton circuit court by appellees and plaintiffs below—a local organization of merchants in and around the city of Covington, Kentucky—with which was joined an independent dealer in some of the commodities to which the act relates, against appellant and defendant below, Glenn Moore, doing business under the trade name of "Moore's Grocery and Meat Market," to enjoin alleged violations of the statute by defendant. In plaintiffs' petition they alleged defendant's violation of the act by selling commodities at his place of business to customers below the cost to him, and with the intention to destroy competition as denounced by the act. Defendant demurred to the petition, which the court overruled and upon his declining to plead further he was permanently enjoined from violating the provisions of the act as set out in the petition and for the purposes therein contained, according to the prayer of the petition, to reverse which he prosecutes this appeal.

Extensive briefs are filed by attorneys for both sides in the litigation, in which practically all the declared law relating to the direct, as well as collateral, questions involved in the case are discussed, and our attention is thus called to all the cases and texts in which it is done. Learned counsel for defendant vigorously contend (1) that the statute is invalid because discriminatory in that motion pictures are exempt from the provisions of its Section 1; and (2) that the act violates certain provisions of our constitution, among which is its

Section 1, Subsections 3 and 5; its Section 2, and also the provisions of the Federal Constitution, Amend. 14, guaranteeing "due process" and "equal protection of the laws." However, as presented in brief, all of the argument of defendant's counsel clusters around their contention that the statute under consideration impairs the rights guaranteed to their client by Subsections 3 and 5 of Section 1 of *our* Constitution, which is a part of its "Bill of Rights," the first of which—Subsection 3—guarantees to the citizens of the commonwealth "the right of seeking and pursuing their safety and happiness," whilst Subsection 5 guarantees to them "the right of acquiring and protecting property." It is admitted that the constitutional guaranties referred to may—when occasions and conditions require it—be regulated by the legislature under its police power, but with the qualification that such regulation shall be based upon some reasonable grounds for the promotion of the interest or welfare of the general public, but not to be exercised arbitrarily so as to destroy the constitutional rights so guaranteed. It is, therefore, argued that the judicially declared interpretation of such constitutional rights and questions by the courts of this country is, that legislatures may not in the exercise of their possessed police power fix prices of commodities dealt with in commercial activities and occupations, unless the particular activity is "affected with a public interest," in which event prices charged for the commodity or service so affecting the public interest may be reasonably regulated, but not arbitrarily so.

Up until some few years ago the adjudged cases—as well as text writers—appear to have largely, if not preponderantly, supported the contention of counsel for defendant in their argument against the right of the legislature to fix prices. Under the law as so declared, until the comparatively recent past, any strictly price fixing statute was considered as violative of guaranteed constitutional rights of the citizen dealing in the commodities for which the price was fixed by the involved statute, unless it was enacted under the police power possessed by the legislature and within the limitations supra, i. e., that it related to prices charged by dealers in commodities "affected with a public interest." But the Supreme Court of the United States in the recent case of Nebbia v. People of the State of New York, 291

U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469— involving the validity of a New York statute fixing the minimum price charged for milk by retail dealers to their customers—in a five to four opinion upheld the statute as not being in violation of any of the constitutional objections urged in this case by counsel for appellant. In the majority opinion the distinction theretofore recognized between pursuits and occupations furnishing commodities "affected with a public interest," and others wherein the furnished commodity was not so classified, was stricken down and the right of the legislature to, at least, fix *minimum* prices therefor was upheld regardless of such prior distinctive classifications. Nevertheless, it was broadly intimated in the majority opinion that the sale of milk was a commodity that might be classed as one "affected with a public interest," because of its extensive and beneficial use by both adults and children, and because of its tendency to soon deteriorate from its natural condition, and its use as such thereby destroyed. The opinion, however, was not based on any determination of the court to that effect, since only a passing reference was made thereto in support of the final determination in holding that the right of the legislature under its police power to, at least, fix minimum prices, prevails in the sale of all commodities, whether "affected with a public interest" or not. The cases declaring the law as it existed prior to the rendition of that opinion are collated in the dissenting opinion written by Mr. Justice McReynolds and in the notes thereto, and which are the cases that are chiefly relied on by counsel for defendant. However, it should not be overlooked that the cases which he cites and relies on— and also the texts to which he refers—are only to the extent of denying the right of the legislature to *absolutely fix* prices.

The domestic statute under consideration is a literal copy of one previously enacted by the legislature of the state of California. The Supreme Court of that state in the case of Wholesale Tobacco Dealers Bureau of Southern California v. National Candy & Tobacco Company, 11 Cal. (2d) 634, 82 P. (2d) 3, 15, 118 A. L. R. 486, in construing the statute of that state from which ours on the same subject is a literal copy, said: "In its true sense it is not a price fixing statute at all. It merely fixes a level below which the producer or distributor

may not sell with intent to injure a competitor. In all other respects price is the result of untrammelled discretion.'' The same interpretation was given to statutes substantially similar in terms in the cases of Rust v. Griggs, 172 Tenn. 565, 113 S. W. (2d) 733; State v. Langley, 53 Wyo. 332, 84 P. (2d) 767; Dunnell v. Shelley, 38 Cal. App. (2d) 118, 100 P. (2d) 830; Associated Merchants of Montana v. Ormesher, 107 Mont. 530, 86 P. (2d) 1031, and State v. Sears, 4 Wash. (2d) 200, 103 P. (2d) 337. Most, if not all, of the cases last referred to, which were rendered since the opinion in the Supreme Court Nebbia case, follow its ruling in discarding the prior distinction requiring the business to be ''affected with a public interest'' before being subject to price regulations, or, at least, to minimum price regulations.

We are, therefore, forced to the conclusion that *today* the highest judicial authority in the country, followed by a number of Supreme Courts of many states of the Union, have each declared that the distinction heretofore existing between a business ''affected with a public interest,'' and one not heretofore so classified, no longer exists, and that until the law, as so latterly declared, is again changed, it is competent for the legislature to at least fix minimum prices for all commodities and services dealt in, rendered, produced or furnished, whether the particular business is or is not one affected with a public interest.

But, notwithstanding such later determinations of the law in the respects indicated, it is nevertheless insisted that our statute embodying the inhibitions in its Section 1, Section 4748h-1, exempts from its provisions motion picture films ''when delivered and under a lease to motion picture houses,'' and for which reason it is discriminatory, which, if true, invalidates the entire act. But that argument was denied in the Wholesale Tobacco Dealers Bureau case supra, and also in that of State v. Sears, supra, wherein the same exemption was involved and the same argument made. Each of those opinions refer to and discuss many cases dealing with the right of the legislature to classify subjects and situations dealt with by the involved statutes, as well as exemptions that might be made from their provisions. Those courts point out reasons and grounds for sustaining the exemption of the motion picture industry from the op-

eration of such statutes. Furthermore, it is a recognized principle—sustained and applied by all courts—that legislative classification should be upheld, unless it clearly appears that it is attempted to be rested on no substantial ground. In the latter event it will be treated as arbitrary and will be set aside by the courts. In the light of the adjudications referred to, and adhering to the general rule adopted by courts to uphold classifications—unless clearly unsupported—we conclude that the circumscribed exemption of the motion picture contracts mentioned in the statute does not constitute a forbidden classification for exempting them from the provisions of the Statutes.

However, the provisions of Section 1 of the act, from which the described character of motion picture contracts are exempted, is not the section embracing the business conducted by defendant, the provisions of which he was alleged in the petition to have violated, and which he admitted by his demurrer thereto. The part of the act applicable to his business is its Section 3, now Section 4748h-3 of our Statutes, involving sales made to individual customers in retail transactions for the inhibited purpose of the statute; whilst Section 1 of the act denounces discrimination in prices as against localities and communities in order to accomplish the same purpose. Defendant is not charged in the petition in this case with having violated Section 1 of the statute, but only with having violated its Section 3. We, therefore, fail to discover any invalidating discrimination against defendant contained in the statute as contended for by counsel.

But it is furthermore argued that the statute as applied to defendant's business is indefinite to the extent of rendering it invalid. But that argument is so clearly without foundation as not to require extended argument to refute it. The provisions of the attacked statute in this case are couched in language capable of being clearly understood, applied and followed, even to the extent of removing all vagueness and all possibility of misinterpretation. But, even if some of its provisions were less clear and understandable, it should not be stricken down for that reason, unless the intention, object and purpose of the legislature was so vaguely presented as to be incapable of intelligent interpretation and correct application. See Old Dearborn Distributing Company v. Sea-

gram's Distillery Corporation, 299 U. S. 183, 57 S. Ct. 139, 81 L. Ed. 109, 106 A. L. R. 1476; People v. Curtiss, 116 Cal. App. Supp. 771, 30 P. 801, and Hygrade Provision Co., Incorporated, v. Sherman, 266 U. S. 497, 45 S. Ct. 141, 69 L. Ed. 402.

Lastly, it is argued that for a statute to be sustainable when enacted under the authority of legislative police power it must appear that its provisions have some substantial tendency to benefit the public, or the general welfare of the people of the sovereignty enacting it, and unless it so appears the enactment will not be upheld. That contention is a correct statement of the law, but with this qualification—that the benefit to be derived from the enactment of the statute is primarily a question for the determination of the legislature, and its determination will not be set aside by the courts unless it manifestly appears to be an arbitrary one and based upon no substantial grounds. The object intended to be accomplished by the domestic act under consideration, and by similar acts prevailing in other jurisdictions, is set forth in its Section 3—incorporated supra—and which (generally stated) is to safeguard the public against the creation and perpetuation of monopolies, and to encourage competition by prohibiting unfair and discriminatory practices. We think there can be no dispute but that the provisions of the act for the accomplishment of its purpose as so declared has a substantial tendency to curtail and prevent the evils against which the statute is directed. That conclusion is fortified by the cases cited supra upholding statutes in other jurisdictions intended to accomplish the same purpose.

In the annotation in 118 A. L. R. supra, beginning on page 506, following the California case of Wholesale Tobacco Dealers Bureau of Southern Colifornia v. National Candy & Tobacco Co., supra, and in the later one in 128 A. L. R. beginning on page 1126, the writer of each of them takes up and discusses all of the previous opinions of the courts in which the questions herein presented were disposed of adversely to the contentions of defendant's counsel, and in support of the validity of the statute involved in each of them. Between the time of writing the first annotation referred to in 118 A. L. R. and the writing of the second one in 128 A. L. R. the same questions came before many additional courts of the country over and above those that had determined

the questions at the time of the first annotation, and it is pointed out in the later annotation that practically all of such additional courts followed the prior ones in sustaining the statute under consideration, and overruling all of the objections urged against its validity which were the same as those now put forward by defendant's counsel for a reversal of the instant judgment. The two annotations referred to embrace a collection and a discussion of all the cases in which the questions here raised were determined, and which determination sustained the validity of the respective statutes under consideration, and held that each objection to their validity was without merit. Therefore, the present condition of the law on the questions involved, in its entirety, may be ascertained by a reading of those annotations without resorting to other sources.

The learned trial judge in passing upon the demurrer to the petition wrote and filed an opinion, in which he ably discussed all of the questions presented and hereinbefore referred to, citing therein the cases supra, and also other relevant ones. In stating his final conclusion he said: "The Kentucky Act, as well as the Acts in other states, was passed in the exercise of the Police Power of our State. In speaking of Police Power, the Supreme Court in the California case (Wholesale Tobacco Dealers Bureau [v. National Candy & Tobacco Co.] supra) said: 'It has now become firmly established that the police power of the state extends not only to the preservation of the public health, safety and morals, but also extends to the preservation and promotion of the public welfare. In recent years the state, in promoting and advancing the general welfare of its citizens, has frequently and properly used this power to promote the general prosperity of the state by the regulation of economic conditions. This apparent extension of the police power is in fact no extension at all.' The great importance of the decision of the California case (supra) as well as the decision of Rust v. Griggs, supra, is that with the change of our social, political and economic conditions, the courts have enlarged the field of conduct which the State under its Police Power may regulate."

That conclusion is, no doubt, the correct one as based on the applicable law as declared up to the *present* time, and which accords with our conclusions as herein-

34

before expressed. We feel that we should follow such interpretations, and especially so when approved by the highest court in the land in the Nebbia case, notwithstanding a vigorous dissent by the minority (four) of the members of that august tribunal.

Wherefore, entertaining that opinion, it necessarily follows that the judgment was and is correct, and it is affirmed.

The whole Court sitting.