Paul E. STEFFEY, L. Louise Steffey and Florence Slack, Partners, doing business under the name and style of Zephyr Cleaners, The Sperry and Hutchinson Company, a corporation, and Gold Bond Stamps, Inc., a corporation, Appellants (Plaintiffs below),

v.

CITY OF CASPER, a municipal corporation, W. S. Anderson, Mayor of the City of Casper, Paul Danigan, Chief of Police of the City of Casper, and Frank Bowron, Municipal Magistrate of the City of Casper, as agents of the City of Casper, Natrona County, Wyoming, Appellees (Defendants below).

CASPER COMMISSARY, INC. et al., Appellants (Intervenors below),

v.

GOLD BOND STAMPS, INC., a Corporation, et al., Appellees (Plaintiffs below),

and

Thomas O. Miller, Attorney General of the State of Wyoming, et al., Appellees (Defendants below).

Norman B. GRAY (substituted for Thomas O. Miller), Attorney General of the State of Wyoming; Bernard E. Cole, County and Prosecuting Attorney, Laramie County, Wyoming; Norbert E. Tuck, Sheriff, Laramie County, Wyoming, Appellants (Defendants below),

v.

GOLD BOND STAMPS, INC., a Corporation; National Gift Seal Company of Wyoming, a Corporation; Pioneer Savings Stamps, Inc., of Colorado, a Corporation; The Sperry and Hutchinson Company, a Corporation, Appellees (Plaintiffs below).

Nos. 2908, 2920, 2933.

Supreme Court of Wyoming.

Nov. 29, 1960.

On Rehearing Jan. 23, 1961.

See 358 P.2d 951.

No. 2908:

Robert A. Burgess, W. J. Wehrli, Houston G. Williams, Casper, John U. Loomis, Cheyenne, Robert W. Sweet and Donald W. Dowd, New York City, Donald C. Rogers, Minneapolis, Minn., for appellants.

Rose, Rose & Fisher, Casper, for appellees.

No. 2920:

Rose, Rose & Fisher, Casper, for appellants.

Robert A. Burgess, Casper, Loomis, Lazear & Wilson, Cheyenne, W. J. Wehrli and Houston G. Williams, Casper, Guy & Phelan, Cheyenne, Casey, Lane & Mittendorf, New York City, and Donald C. Rogers, Minneapolis, Minn., for appellees.

No. 2933:

Norman B. Gray, Atty. Gen., and Bernard E. Cole, County and Pros. Atty., Cheyenne, for appellants.

Guy & Phelan and Loomis, Lazear & Wilson, Cheyenne, W. J. Wehrli and Winter, Burgess & Forrister, Casper, Casey, Lane & Mittendorf, New York City, and Levitt, Palmer & Rogers, Minneapolis, Minn., for appellees.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

Mr. Chief Justice BLUME delivered the opinion of the court.

Two cases involving the validity of the so-called trading stamps were consolidated for hearing in this court. In one of these cases, from Laramie County, called the Cheyenne case, Gold Bond Stamps, Inc., et al., were plaintiffs and the Attorney General and the County and Prosecuting Attorney and Sheriff of Laramie County were defendants. The plaintiffs in this case alleged the invalidity of Ch. 84, S. L. of Wyoming, 1959, prohibiting, with certain exceptions, the use of trading stamps, and asked that the defendants be forbidden to

enforce the statute. The court granted the prayer of plaintiffs and held the statute unconstitutional as depriving the plaintiffs of the equal protection of the laws and depriving them of their property without due process of law. The defendants have appealed. In the second case, from Natrona County, called the Casper case, Paul E. Steffey and others were plaintiffs and the City of Casper and officers thereof were defendants in an action in which the plaintiffs sought to prevent the enforcement of an ordinance of the City of Casper passed July 21, 1958, prohibiting, with certain exceptions, the use of trading stamps. The ordinance is very similar to the statute above mentioned, and need not be set out herein. The trial court of Natrona County held the ordinance valid and an appeal was taken from that holding. In that case a good deal of evidence was taken and by stipulation was made a part of the Cheyenne case. It is not, we think, necessary to set out this testimony except incidentally as we proceed in this opinion.

Ch. 84, supra, provides:

"Issuance of Trading Stamps Unlawful

"Section 1. It shall be unlawful for any person, firm, association or corporation to use, issue, or distribute, or for any person, firm, association or corporation to furnish to any other person, firm, association or corporation to use, issue or distribute, in, with, or for the sale of goods, wares, merchandise or service, any stamps, coupons, tickets, certificates, cards, or other similar devices, which shall entitle the purchaser receiving the same with the sale of goods, wares, merchandise or service to procure from any person, firm, association or corporation, any goods, wares, merchandise or service upon the production of any number of such stamps, coupons, tickets, certificates, cards or other similar devices.

"Exceptions To Act

"Section 2. This Act shall not apply to the use, issuance, distribution, furnishing or redemption of any coupon, ticket, certificate, card or other similar device which is;

"(a) issued, distributed, furnished or redeemed by a manufacturer or packer in connection with the sale of its manufactured or packed products, when such coupon, ticket, certificate, card or other similar device is redeemable, without or accompanying cash not exceeding Five Dollars ($5.00) for any product of said manufacturer or packer or for one specified and particular product not manufactured or packed by said manufacturer or packer;

"(b) issued, distributed, furnished or, redeemed by a merchant when such coupon, ticket, certificate, card, or other similar device is redeemable at face value, in cash or merchandise from the general stock of said merchant at regular retail prices at the option of the holder thereof."

Section 3 provides for penalty of violation of the statute and need not be set out herein. Section 4 of the Act provides as follows:

"Provisions of Act Severable

"Section 4. If any sentence, clause, provision or section of this Act shall be held unconstitutional, such decision shall not affect the validity or the constitutionality of any other sentence, clause, provision or section herein contained and it shall be conclusively presumed that the legislature would have enacted the remainder of this Act without the sentence, clause, provision or section so held unconstitutional."

The parties in the Cheyenne case entered into a stipulation of facts. These facts would seem to be applicable also in the Casper case. Leaving out nonessentials,

the stipulation provides: The plaintiffs are engaged in the business of furnishing trading stamps to merchants and the manner of conducting the business is about as follows: Plaintiffs enter into a contract with retail merchants under which plaintiffs are obligated to furnish these merchants with trading stamps, books to be given to collectors of these stamps and catalogs of merchandise available to stamp collectors. Under the contract plaintiffs are obligated to redeem the trading stamps in exchange for goods or merchandise in accordance with the contracts, the stamp collectors' books and the merchandise catalogs. The purchaser of these stamps agrees to use them in his business, to issue to each customer paying cash one stamp for each ten cents represented in such payment, and to give to his customers books and catalogs mentioned above. A customer paying cash collects the stamps and pastes them in the stamp collector's book. When at least one book has been filled, the customer may surrender it to the respective plaintiff issuing the stamps for redemption in merchandise as mentioned in the catalog. All customers paying cash receive stamps on an equal and uniform basis and are able to ascertain definitely the value of the stamps by reference to the merchandise redemption catalogs. The plaintiffs are in competition with each other. The trading stamps of one plaintiff are not interchangeable with those of any other. There are 225 companies throughout the United States issuing trading stamps. They have annual sales of over 600 million dollars and trading stamps are now being saved by over half of the families in the United States. In the calendar year 1958 the licensees of plaintiffs issued approximately 250 million stamps of the plaintiffs to consumers in the State of Wyoming, many of which are still in the hands of such consumers in partially completed stamp collectors' books. Gold Bond has 12,000 licensees throughout the United States; Red Stamps, 1,500; Pioneer Stamps, 300; and Sperry & Hutchinson, over 62,000. From 1,020 to 1,500 stamps are required to fill a book. The catalogs include some 500 to 700 items of merchandise and roughly 1,000 additional items are available which are not described in the catalogs. The merchants having contracts with the trading stamp companies pay the plaintiffs for the right to use their stamps at the rate of two to three percent of the total sales. Trading stamps supplied by the plaintiffs are but one of the promotional devices used by merchants throughout the State of Wyoming in the past and present. Other trade promotional devices are cash discounts, trading stamps and coupons of manufacturers, trading stamps of the issuing merchant redeemable in cash or from his stock of goods and other advertising and promotional devices. The profits from the contracts of the plaintiffs with the merchants result from the difference between the total income received and the total of the cost of the merchandise redeemed and the cost of operation including salaries, plants and equipment, advertising and other operating expenses. Not all the trading stamps issued by the merchants are redeemed. That is true in connection with five to ten percent as appears from the allowance made by the Treasury Department of the United States. Plaintiffs have expended nationally in the calendar year of 1958 over three million dollars in advertising, developing and popularizing their trading stamp systems. They expend annually ninety thousand dollars in the State of Wyoming in advertising these stamps. The operation of trading stamp systems has resulted in establishing property rights belonging to the plaintiffs.

1. The constitutionality of legislation such as, or similar to, that before us has been passed upon by many courts. Annotations on the subject are contained in 26 A. L.R. 707, 124 A.L.R. 341 and 133 A.L.R. 1087. It appears therefrom that many more cases have held such legislation unconstitutional than those that have held the contrary. Some of the recent cases condemning such legislation are Sperry & Hutchinson Co. v. McBride, 1940, 307 Mass. 408, 30 N. E.2d 269, 131 A.L.R. 1254; Alabama Independent Service Station Ass'n v. McDowell, 1942, 242 Ala. 424, 6 So.2d 502; and State

v. White, 1956, 199 Tenn. 544, 288 S.W.2d 428. Most of the cases upholding such legislation have been decided in or since 1916 when the Supreme Court of the United States held such legislation valid. The fact that so many decisions have struck down such legislation as an arbitrary interference with legitimate business necessarily gives us pause, just as it did the Supreme Court of the United States. Some of the members of the Supreme Court of Kansas, when that court decided State v. Wilson, 1917, 101 Kan. 789, 168 P. 679, L.R.A.1918B, 374, which upheld such legislation, had misgivings as to the correctness of the decision. In the later case of State v. Crosby Bros. Mercantile Co., 1918, 103 Kan. 733, 176 P. 321; Id., 1918, 103 Kan. 896, 176 P. 670, the member of the court writing the decision stated at 176 P. 323:

"It is again urged as in the Wilson Case, supra, that the statute violates the federal and state constitutions. The determination of those phases of the controversy was by no means free from difficulty, and some of the justices, including the writer, assented thereto with considerable misgiving, but the lapse of time has merely matured and confirmed our views of the correctness of the decision of the court as then announced. * * *"

We too have had our misgivings but the reason for pause and misgiving is not altogether one-sided. When we find that legislature after legislature all over the nation has in the course of years tried to get rid of trading stamps, we cannot help but feel that we are confronted with a rather unusual situation, and while this court along with others prefers to follow the majority of decisions on a point of law, if reasonable, it would seem that in the case at bar we must make our independent investigation and come to an independent conclusion.

The cases holding the legislation like that at bar, or similar legislation, is unconstitutional are based in the main on the holding that merchandising is not a business affected with a public interest and that hence legislation concerning it is outside of the scope of the police power. See Alabama Independent Service Station Ass'n v. McDowell, supra. The police power was discussed at considerable length by Justice Roberts, an able and conservative jurist, who had this to say in the case of Nebbia v. People of State of New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 512, 515–517, 78 L Ed. 940, 89 A.L.R. 1469:

"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. Regulation of a business to prevent waste of the state's resources may be justified. And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency.

"Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of price discrimination. * * *

*   *   *   *   *   *

"It is clear that there is no closed class or category of businesses affected with a public interest * * *. The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. * * * But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a

state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. * * *

" * * * The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. * * *" (Emphasis supplied.)

The justice quoted with approval Rast v. Van Deman & Lewis Company, 1916, 240 U.S. 342, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A. 1917A, 421, Ann.Cas.1917B, 455, which upheld legislation condemning trading stamps. We might say in this connection that the merchants in this state constitute a substantial group of people. In Tyson & Bro. United Theatre Ticket Offices, Inc., v. Banton, 1927, 273 U.S. 418, 47 S.Ct. 426, 434, 71 L.Ed. 718, 58 A.L.R. 1236, Mr. Justice Holmes, in a dissenting opinion, stated:

" * * * the notion that a business is clothed with a public interest and has been devoted to the public use is little more than a fiction intended to beautify what is disagreeable to the sufferers. * * *"

In the case of Florida Dry Cleaning & Laundry Board v. Everglades Laundry, Inc., 1939, 137 Fla. 290, 188 So. 380, 382, 383, the court stated that the statement:

" 'Affected with a public interest' has heretofore been the criterion to determine whether or not a business was subject to regulation under the police power, but that qualification has been stripped of its mystery. 'Affected with a public interest' is mere redundancy and in no sense qualifies the power of the legislature to regulate except to say that regulation begins when the legislature deems that the public good requires that it be done and it is not material whether the business be public or private."

To the same effect are Moore v. Northern Kentucky Independent Food Dealers Ass'n, 1941, 286 Ky. 24, 149 S.W.2d 755; McElhone v. Geror, 1940, 207 Minn. 580, 292 N.W. 414; and Louisiana Wholesale Distributors Ass'n, Inc., v. Rosenzweig, 1948, 214 La. 1, 36 So. 2d 403. So it seems that the fact that the business of a merchant is not a business affected with the public interest does not itself mean a great deal. To make that statement is to a more or less extent an arbitrary determination. It is somewhat like the ipse dixit used in connection with Aristotle in the past ages. We must go further and determine whether or not good may be accomplished by the legislation here in controversy.

We might say in this connection that counsel who are in favor of trading stamps admit that the legislature may make reasonable regulations of any business but that it may not prohibit it. We agree. But the legislature has not prohibited business. It has merely prohibited an incident to or a particular method in connection with business. That is merely regulation. We discussed the question of regulation and prohibition in the case of Blumenthal v. City of Cheyenne, 1947, 64 Wyo. 75, 186 P.2d 556, where we pointed out that regulation necessarily implies restriction in some respects and that that means nothing more or less than a partial prohibition. See further on the subject 36 Words & Phrases, Regulation, p. 719 et seq. So the question before us is as to whether or not the legislative regulation is reasonable, and we agree that if it subserves no good purpose but is merely arbitrary and capricious it should be held to be unconstitutional.

A respectable minority of at least twelve cases has held that legislation stopping (or curbing) the use of trading stamps by merchants is valid. These cases are as follows: Lansburgh v. The District of Columbia, 1897, 11 App.D.C. 512; District of Columbia v. Kraft, 1910, 35 App.D.C. 253, 30 L.R.A.,N.S., 957, certiorari denied 218 U.S. 673, 31 S.Ct. 223, 54 L.Ed. 1205; Rast v. Van Deman & Lewis Company, 1916, 240 U.S. 342, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A.

1917A, 421, Ann.Cas.1917B, 455; Tanner v. Little, 1916, 240 U.S. 369, 36 S.Ct. 379, 60 L.Ed. 691; Pitney v. State of Washington, 1916, 240 U.S. 387, 36 S.Ct. 385, 60 L.Ed. 703, affirming 80 Wash. 699, 141 P. 883; State v. Wilson, 1917, 101 Kan. 789, 168 P. 679, L.R.A.1918B, 374; State v. Crosby Bros. Mercantile Co., 1918, 103 Kan. 733, 176 P. 321; Id., 1918, 103 Kan. 896, 176 P. 670; State v. Underwood, 1916, 139 La. 288, 71 So. 513; State v. Pitney, 1914, 79 Wash. 608, 140 P. 918, Ann.Cas.1916A, 209; Sperry & Hutchinson Co. v. State, 1919, 188 Ind. 173, 122 N.E. 584, with one exception; State ex rel. Sperry & Hutchinson Co. v. Weigle, 1918, 166 Wis. 613, 166 N.W. 54, Ann.Cas.1918D, 707; State v. J. M. Seney Co., 1919, 134 Md. 437, 107 A. 189; and Ed. Schuster & Co. v. Steffes, 1941, 237 Wis. 41, 295 N.W. 737, 133 A.L.R. 1071. We shall presently comment on some of these cases.

■ A good deal of testimony was introduced in the Casper case. We do not think that it is necessary to set out the testimony in detail except to say that it bears out at least many of the matters which are hereinafter mentioned. It is a rule of law well settled that if a state of facts could exist which would justify the legislature in forbidding the use of trading stamps it must be presumed to have existed. Munn v. Illinois, 1876, 94 U.S. 113, 24 L.Ed. 77; State v. Hobson, 1951, 7 Terry 381, 46 Del. 381, 83 A.2d 846; Naudzius v. Lahr, 1931, 253 Mich. 216, 234 N.W. 581, 74 A.L.R. 1189; Borden's Farm Products Co. v. Baldwin, 1934, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281; State v. Rossman, 1916, 93 Wash. 530, 161 P. 349, L.R.A.1917B, 1276; State v. Pitney, 1914, 79 Wash. 608, 140 P. 918, Ann.Cas.1916A, 209; Rast v. Van Deman & Lewis Company, 1916, 240 U.S. 342, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A.1917A, 421, Ann.Cas.1917B, 455; and 11 Am.Jur. Constitutional Law § 306, p. 1089.

We think that the legislature had a right to find the following facts: When any one of the merchants in the same line of merchandizing uses trading stamps, that is apt to have the effect of compelling the merchants in the same line of business to also use the stamps or else be forced out of business. That is clearly substantiated by the testimony in this case. When all of the merchants in the same line of business use these trading stamps, whatever benefit the use of stamps might have had is apt to be equalized, resulting in a burden to all the merchants in the same line of business, and is apt to have a further tendency to increase the price of goods in order to recoup the cost of the trading stamps and, furthermore, a tendency to compel some of the merchants to go out of business, thus decreasing competition, giving those merchants who are able to stay in business the power to raise the price of goods contrary to the public interest. We might further mention, though it may not be of any great importance, that when a customer has purchased say $100 worth of goods but less than the amount needed to constitute a book used in connection with trading stamps, and he thereafter finds for some reason or other that he wishes to discontinue trading with the particular merchant, he will either lose the benefit of the trading stamps or be compelled to continue trading with the same merchant, thus interfering to a more or less extent with free trading on the part of the public.

■ In the Rast case, supra, the United States Supreme Court said in part at 36 S.Ct. 377:

"* * * They [trading stamps] tempt by a promise of a value greater than that article and apparently not represented in its price, and it hence may be thought that thus by an appeal to cupidity lure to improvidence. This may not be called in an exact sense a 'lottery,' may not be called 'gaming;' it may, however, be considered as having the seduction and evil of such, and whether it has may be a matter of inquiry,—a matter of inquiry and of judgment that it is finally within the power of the legislature to make. Certainly in the first instance, and, as we have seen, its judgment is not impeached by urging against it a difference of opinion. * * * And it is not required that we should be sure as to

the precise reasons for such judgment, or that we should certainly know them or be convinced of the wisdom of the legislation. * * *"

In the Tanner case, supra, the United States Supreme Court, speaking of trading stamps, said at 36 S.Ct. 384:

"* * * There must, therefore, be something more in it than the giving of discounts, something more than the mere laudation of wares. If companies—evolved from the system, as counsel say in justification of them—are able to reap a profit from it, it may well be thought there is something in it which is masked from the common eye, and that the purchaser at retail is made to believe that he can get more out of the fund than he has put into it, something of value which is not offset in the prices or quality of the articles which he buys. It is certain that the prices he pays make the efficiency of the system * * *. The system, therefore, has features different from the ordinary transactions of trade which have their impulse, as we have said, in immediate and definite desires having definite and measurable results. There may be in them at times reckless buying, but it is not provoked or systematized by the seller."

In the Washington case of State v. Pitney, supra, the court, among other things, said at 140 P. 920:

"It follows, then, that if a state of facts could exist which would justify the Legislature in forbidding the use of trading stamps, it must be presumed to have actually existed. What state of facts might reasonably have prompted the Legislature to forbid the use of trading stamps in connection with the sale of merchandise? It might reasonably be supposed or presumed that the Legislature believed that the use of these stamps would encourage indiscriminate and unnecessary purchasing by people ill able to indulge in any extravagance. Or suppose that the Legislature believed that the use of these stamps was practically forced upon certain merchants without any practical benefit resulting therefrom, and thus they were compelled to pay 3½ per cent. upon their gross sales for the use of the stamps. The Legislature might reasonably have believed that the stamp companies, in order to cause the stamps to be used in a certain city, would contract with one merchant for their use, agreeing to pay him a percentage of the sums collected by them from other merchants, and then use the first contract so secured to force other merchants into using the stamps, or suffer loss of trade by failure so to do. In other words, that legitimate business was virtually coerced into paying tribute to the stamp company, a nonproducer of wealth or value."

We might say in that connection that any coercion either in the economic line or any other should be able to be suppressed by the legislature. In the Louisiana case of State v. Underwood, supra, it appears that a heavy license tax had been imposed upon those who used trading stamps and the court said in that connection at 71 So. 518:

"* * * Whatever others may think, therefore, it is fairly evident that the people of Louisiana have been, for 15 years, of the opinion that the trading stamp business is not an industrial pursuit, working no harm to the community, but is a mere parasite, seeking to fatten upon such pursuits, and that they have endeavored to make it unlawful, and are now endeavoring to so tax it as, at least, to discourage its development. * * *"

In the Wisconsin case of State ex rel. Sperry & Hutchinson Co. v. Weigle, supra, the court, after referring to a number of cases in connection with trading stamps, had this to say at 166 N.W. 58:

"We are persuaded that those decisions should be followed in that the practical effect of the trading stamp schemes as complainants in the instant cases have evolved and applied them in the conduct of their business result in pernicious and evil effects * * *."

In the case of District of Columbia v. Kraft, supra, it was said at 35 App.D.C. 269:

"Now, what are the conditions presented by the facts in this case? An entirely unnecessary middleman, for his own profit solely, has injected himself between the regular merchant on the one hand, and his customers on the other. He receives $3.50 for every thousand stamps issued to the customers, and redeems such as may be presented, in goods or in cash at $2 per thousand. By this means the corporation represented by the defendant in error has in the first year of its intervention received about $12,000, which should have either been retained by the merchant or received by his customers.

"Several other concerns being engaged in the same business, their profits are probably as great, if not greater. We have then this large sum of money annually taken from the merchant and his customers, and added to the gross cost of living of all of the people of the District, without return. Is it not for the public welfare, in the juridical sense of the term, to prohibit such an undertaking? We think that it is. Must this public welfare be sacrificed to the unlimited freedom of contract invoked in this case, to protect the right to prey upon local commerce? We think not."

In the Kansas case of State v. Wilson, supra, the court in upholding anti-trading stamp legislation said in part at 168 P. 683, 684:

" * * * If the use of trading stamps tends to induce persons to make purchases beyond the limit which they would otherwise observe, and beyond their reasonable needs, if may be regarded as to that extent inimical to the interest of the public. For the state to attempt to protect the individuals constituting the general public from the consequences to themselves of their own improvidence may be highly paternalistic, but that does not prevent its being a legitimate exercise of the police power.

"The trading stamp device offers an inducement to make purchases from the merchant using them, which is not connected with the merits of his goods, or with his customer's need of them. It lends itself readily to fostering a belief on the part of the buyer that the stamps cost him nothing—that they are given as lagniappe. And this may be true, in the sense that by their use the merchant saves enough in advertising so that he can and does make a less price to his customers. But that in a broad sense the buyer pays for all that he gets will hardly be disputed. There seems to be a widespread belief that there is an element of possible deception in this aspect of the scheme. Whether the plan may reasonably be expected to cause improvident purchases, whether in practice it does so, and whether it tends to mislead the buyer, are questions for the final determination of the Legislature if there is any reasonable ground whatever for a difference of opinion on the subject. * * *"

Justice McAllister, with whom Justice Potter concurred, in a dissenting opinion to People v. Victor, 1939, 287 Mich. 506, 283 N.W. 666, 685, 124 A.L.R. 316, succinctly summarized the various factors which a court should take into consideration and which would authorize a court in upholding the constitutionality of a statute. Justice McAllister stated as follows:

"Various states of facts, it would appear, can be reasonably conceived that could justify the legislature in enacting this statute; many have been outlined in the cases. The legislature may have had in mind that the ordinary gasoline distributor usually is not a dealer in china and glassware and other merchandise distributed in a well organized, mathematically planned premium system, and that premium companies organized on a large scale are necessary adjuncts; that legitimate business is virtually coerced into pay-

ing tribute to such organizations in order to compcte; that the exclusive advantage given by contract between such a premium organization and a dealer selected in a certain district unfairly deprived other legitimate dealers of their customers; that the introduction of such middlemen increase the costs to the buyer and seller of petroleum products, and that they were both to be protected by such legislation; that such a practice thrust an additional and unnecessary cost on distribution which must ultimately be borne by the public, and under a competitive system, it cannot be successfully resisted by individuals; that if such dealers did not enter into the plan of a premium company or into the business of giving premiums, price cutting would necessarily follow on the part of those not partaking in such a plan; and that in a market where consumption does not substantially vary with prices a price war would have evil effects upon the public and the individual sellers with a possible extermination of those who were not able to survive such price war, and a resultant tendency to eliminate competition. The legislature could have believed that it was contrary to the public interest that citizens should be deceived by trade methods and stratagems into a mistaken belief that they received something for nothing; that the public was entitled to know the real price of the commodities it paid for, and that, in view of the foregoing, it was determined that such businesses were parasitical and should be eliminated, needless middlemen adding their profits to the costs of necessities, removed from the stream of trade, and dangers of price wars averted by the enactment of such a statute. See State of Wyoming v. Langley, 1938, [53 Wyo. 332], 84 P.2d 767. Whether such legislative judgment would be disputable, or unwise or injudicious, I cannot agree that in such a case it would be unreasonable, arbitrary, and capricious

without any conceivable relation to the public interest."

Further, it may not be amiss to call attention to the well-considered dissenting opinion of Chief Justice Garfield of the Iowa Supreme Court, with whom two other justices concurred, in the recent case of Sperry & Hutchinson Co. v. Hoegh, 1954, 246 Iowa 9, 65 N.W.2d 410, with much of which we agree. He considered many of the so-called majority decisions on the subject before us and pointed out that most of the early decisions on the subject, some fifty years or more ago, were decided on the theory that the police power was much more limited than is universally accepted at the present time, and we might add that at that time it was probably difficult for judges to escape the impact of the doctrine of laissez faire which was quite prevalent during the 19th century. The chief justice further pointed out at 65 N.W. 2d 426 that:

"* * * a so-called company stamp plan might practically be forced upon unwilling dealers by threats of loss of trade if they do not 'sign up.' * * *

"When this law was passed the legislature may have concerned itself with the increased cost of living and sought means of combatting it. * * *"

He further stated that he was not so credulous as to believe that the trading stamps were merely a discount plan. "If plaintiff's plan is a mere discount for cash it would seem dealers are unwise to pay so much for so little." 65 N.W.2d 422.

It is not necessary to adopt all the reasoning given in these various cases. Thus we hardly think that those who take stamps are actuated by cupidity or improvidence as mentioned in the Rast case. Nor need we say that legislation such as before us is paternalistic or that the stamp plan leads to deception or is misleading as mentioned in the Kansas case. All we mean to say is that the opinions as a whole lead us to believe that legislation which condemns the use of trading stamps can hardly be said to be arbitrary and capricious.

Let us state the matter from a little different standpoint. There can be hardly any doubt, or at least the legislature could find, as heretofore indicated, that there may be many instances when a merchant with limited capital will, under the system of trading stamps, be unable to compete with opulent merchants and will be compelled to go out of business and may even become bankrupt if he has to pay some two to three percent of his gross sales for trading stamps. Without the lure of trading stamps he might be able to stay in business or at least the legislature had the right to find that to be a fact. The lure of trading stamps is an evil, as heretofore pointed out by some of the authorities, and the legislature has the right to suppress it. It is idle to say that the use of trading stamps has the same effect merely as advertising in the ordinary manner. There is a distinct difference. The former contains a lure. The other does not. It can hardly be said that to force a man of little capital to go out of business or become bankrupt is not an evil. The legislature has the right to reasonably equalize opportunities in the economic field as we have heretofore held. Mr. Justice Roberts in the case of Great Atlantic & Pacific Tea Co. v. Grosjean, 1937, 301 U.S. 412, 57 S.Ct. 772, 778, 81 L.Ed. 1193, 112 A.L.R. 293; Id., 302 U.S. 772, 58 S.Ct. 3, 82 L.Ed. 599, stated in part:

"If, in the interest of the people of the state, the legislature deemed it necessary either to mitigate evils of competition as between single stores and chains or to neutralize disadvantages of small chains in their competition with larger ones, or to discourage merchandising within the state by chains grown so large as to become a menace to the general welfare, it was at liberty to regulate the matter directly or to resort to the type of taxation evidenced by the Act of 1934 as a means of regulation. * * *"

And in the case of State v. Langley, 53 Wyo. 332, 84 P.2d 767, 772, 773, this court stated:

"* * * The Federal Trade Act, the validity of which is not questioned, was passed in 1914. That Act, 15 U.S. C.A. § 45, declared unfair methods of competition in commerce unlawful. That in its ultimate analysis is true under the statute before us. Its aim is to maintain fair competition, but to prevent unfair and ruinous competition. Whether free and unlimited competition, or the contrary, shall prevail, is an economic question, and the policy with reference thereto is, primarily at least, for the legislature to determine. * * * The statute evidently seeks to protect not only the public, but also individual competitors; it seeks to give the latter a fair opportunity in the economic field. It has been held that, in the furtherance of promoting economic welfare, the legislature may, for the public good, in a reasonable manner, equalize economic opportunities. * * *"

In McElhone v. Geror, 1914, 207 Minn. 580, 292 N.W. 414, 416, 417, the court, in considering a legislative act similar to that considered in the Langley case, had this to say:

"The measure is definitely designed to protect the weak against the strong. The strong have no unlimited constitutional power so to use their strength as to crush the weak. Therefore, in the field of trade, why is it not competent for a law bearing on all alike to bar an artificial and wholly harmful practice tending to eliminate the weak and leave the whole field to the strong? We see therein no violation of the constitutional guaranties of due process. The independent merchant, small or large, is a legitimate object of legislative solicitude. It cannot be otherwise in view of his contribution to the building of, and his present place in, our economic structure.

"If the legislature may protect the public from harmful results of restraint of trade, we see no reason to deny a similar power to shield from the

damaging effects of unrestricted competition. * * * 'So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose.' Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469."

See also May's Drug Stores, Inc., v. State Tax Commission, 1950, 242 Iowa 319, 45 N.W.2d 245, quoting with approval at some length from State v. Langley, supra, as to the independent merchants. In Wholesale Tobacco Dealers Bureau of Southern California, Inc., v. National Candy & Tobacco Co., 1938, 11 Cal.2d 634, 82 P.2d 3, 118 A. L.R. 486, the court pointed out that the use of loss leaders was condemned by many economists. We can see no perceptible difference between the use of loss leaders and the use of trading stamps. The effect in each case is the same unless or until the competing merchant yields to what is practically a coercion and also uses trading stamps at a great expense. In short, the legislative act under consideration herein is, in part at least, nothing less than a fair trade act differing from that considered in State v. Langley, supra, but having a similar aim and effect. See the Wisconsin case of Ed. Schuster & Co. v. Steffes, supra. That a fair trade act is constitutional has been held in numerous and comparatively recent cases. See Annotations in 118 A.L.R. 506 and 128 A.L.R. 1126.

We have set out the various factors which the legislature could have considered when the legislative act in question was passed, and we have been impelled to quote from many cases in order to illustrate that. Some of the cases holding such a statute unconstitutional may be distinguished. See the opinion of Chief Justice Garfield heretofore mentioned. In State v. Dalton, 22 R.I. 77, 46 A. 234, 48 L.R.A. 775, 84 Am.St.Rep. 818, one of the first cases involving the subject before us, decided in 1900, the court, referring to Lansburgh v.

District of Columbia, 11 App.D.C. 512, stated distinctly at 46 A. 239: "In so far as the opinion—which is a very vigorous one—condemns the trading-stamp business it describes, *we are not disposed to differ therefrom.*" (Emphasis supplied.) In Young v. Commonwealth, 1903, 101 Va. 853, 45 S. E. 327, 329, the court relied upon State v. Dalton, supra, and quoted therefrom as follows:

"'It may be demoralizing to legitimate business for two great rival dry goods houses to cut prices in the attempt to undersell each other, or for two competing railway lines to sell tickets at half price in the attempt of each to get an advantage over the other, yet probably no one would claim that such competition could be prohibited by law. "Bargain sales" and "bargain counters" may be demoralizing to business, but probably no one would claim that they can be abolished by law.'"

How far that doctrine differs from the concept of the scope of the police power of today is quite evident from the cases referring to the fair trade statutes already mentioned. Most of the cases decided before 1916 may be distinguished by reason of the fact that the scope of police power was considered much more limited than it is today. That is not true, however, in State ex rel. Hartigan v. Sperry & Hutchinson Co., 1913, 94 Neb. 785, 144 N.W. 795, 49 L.R.A.,N.S., 1123, where the court recognized that the scope of the police power had lately been extended but held that it had not gone so far as to hold anti-trading stamp legislation constitutional. In general, it may be said, as already heretofore mentioned, that the fundamental thought in cases holding anti-trading stamp legislation unconstitutional is that such business is legitimate and that the legislature has no right to interfere therewith. In Lawton v. Stewart Dry Goods Co., 1923, 197 Ky. 394, 247 S.W. 14, 26 A.L.R. 686, the court considered some of the objections raised in connection with trading stamps and held the objections to be fanciful. Other courts disagree, including the Federal Supreme

Court. So we are confronted with divergent views. Where, ask counsel for the trading stamp companies, not inappropriately, is legislation in connection with business to stop? Frankly, we do not know. It is true that there must be a limitation if the constitution is to remain a living force. The question is as to whether or not the limit has been reached in this case. Some courts hold that it has been. Others hold the contrary. We are not seers. The future is impenetrable. All we can say is that "Sufficient unto the day is the evil thereof."

■ It was stated by Justice Frankfurter in Safeway Stores, Incorporated, v. Oklahoma Retail Grocers Association, Inc., 1959, 360 U.S. 334, 79 S.Ct. 1196, 3 L.Ed.2d 1280, that trading stamps have had a checkered career. So they have. The first case that struck down anti-stamp legislation as unconstitutional was in 1888 in the case of People v. Gillson, 109 N.Y. 389, 17 N.E. 343, 4 Am.St.Rep. 465. That case is the fountainhead of nearly all subsequent decisions taking a like view. It was cited for instance in the early Rhode Island and Virginia cases which in turn served as the fundamental basis for subsequent cases. Now, after nearly three-quarters of a century, comes along another legislature and bans trading stamps and we are asked to follow the New York case. But that case was decided at a time when the laissez-faire doctrine of Adam Smith, Ricardo and Herbert Spencer was in full swing and which at that time had a beneficial effect on the economic conditions of England. But times and conditions change. As population increases, more and more conflicting interests arise, tending to decrease the liberty possessed by former generations. So we must make a choice, difficult as that may be. After reading the evidence in the Casper case which shows that merchant after merchant was practically coerced to buy trading stamps to meet competition, and after reading the many cases on the subject, we think that we cannot say that the legislation in question here, except as hereinafter mentioned, is arbitrary or capricious and has no reasonable relation to the evil sought to be suppressed. Justice Frankfurter said in the case of Safeway Stores, Incorporated, v. Oklahoma Retail Grocers Association, Inc., supra, at 79 S.Ct. 1201, that "Certainly this Court will not interpose its own economic views or guesses when the State has made its choice." So in this case this court should not interpose its economic views when the people of the state through their legislature have made their choice. The rule is universal that a statute should not be construed unconstitutional unless the unconstitutionality is clear and, as some of the authorities say, unless its unconstitutionality is beyond a reasonable doubt. We think that the unconstitutionality is not clear or beyond a reasonable doubt, as evidenced by the many cases decided by at least seven different courts of the nation. We think the legislative Act in question must be held valid and constitutional except as hereinafter noted. Relief, if any, for trading stamp companies, or for the housewives who feel affronted by being denied the privilege of shopping for the bonuses they believe trading stamps offer them, must be sought at the hands of the legislature and not at the hands of this court.

■ 2. The legislation here in question, namely § 2(b), Ch. 84, S.L. of Wyoming, 1959, exempts stamps "issued, distributed, furnished or redeemed by a merchant when such coupon, ticket, certificate, card, or other similar device is redeemable at face value, in cash or merchandise from the general stock of said merchant at regular retail prices at the option of the holder thereof." It is contended that there is no distinction between stamps redeemable by stamp companies and those redeemable by the merchants themselves, and that, hence, it is an unwarranted discrimination and an unlawful classification. It was held in the Kansas case of State v. Wilson, supra, that a difference exists in such a case and that the distinction and classification is valid. The overwhelming weight of authority is to the contrary. In State v. Holtgreve, 1921, 58 Utah 563, 200 P. 894, 898, 899, 26 A.L.R. 696, the court reasoned as follows:

" * * * If, now, we apply the doctrine of classification to the stipulated facts in this case, how can it reasonably be contended that there is a basis for classification in the use of trading stamps between a merchant who furnishes, uses, and redeems his own stamps and the merchant engaged in the same business who obtains his trading stamps from another who has agreed to redeem them upon the order of the latter merchant? The only difference between the transactions is that the merchant first named redeems the stamps issued by him by delivering to his customers the agreed value thereof as a discount for cash purchases, while the merchant last named enters into an agreement with another that such other shall redeem the stamps upon his order by paying the customer the agreed cash value thereof or by delivering to him some article or articles of merchandise of his own choosing which is of the value represented by the stamps. In either case the legal and moral effect of the transaction is precisely the same. In both cases the customer receives the discount that the merchant agreed to allow him for cash purchases, nothing more, nothing less. There is, therefore, no basis for a distinction or classification, but the classification, if one be made, is purely fanciful, capricious, and artificial. As pointed out, however, under our statute the basis for a classification is still more visionary, in that the statute taxes those stamps only which are purchased from another and which are used as stated in the statute."

Similar in effect are the following cases: Sperry & Hutchinson Co. v. Hoegh, 1954, 246 Iowa 9, 65 N.W.2d 410; Sperry & Hutchinson Co. v. State, 1919, 188 Ind. 173, 122 N.E. 584; People ex rel. Wykes v. Sperry & Hutchinson Co., 1917, 197 Mich. 532, 164 N.W. 503, L.R.A.1918A, 797; State v. Dodge, 1904, 76 Vt. 197, 56 A. 983; People ex rel. Appel v. Zimmerman, 1905, 102 App.Div. 103, 92 N.Y.S. 497; In re Opinion of the Justices, 1917, 226 Mass. 613, 115 N.E. 978; State v. Dalton, 1900, 22 R.I. 77, 46 A. 234, 48 L.R.A. 775, 84 Am.St. Rep. 818. After reading these cases and listening to the forceful argument of counsel (Mr. Wehrli) on this point, we are inclined to agree that it may be doubtful that the classification is warranted. If not warranted, it is void as running counter to the provision for uniformity of legislation as stated in Art. 1, § 34, of our constitution, but that does not necessarily mean that the whole legislative act is void. The controlling factor is the intention of the legislature, if that can be ascertained. Since the legislation in question was enacted in the light of the fact of many trading stamp companies operating in this state, and it not appearing that many merchants issue or redeem trading stamps of their own, and considering the separability clause of § 4, Ch. 84, S. L. of Wyoming, 1959, it is perfectly clear, we think, that the legislature intended that § 1 of the legislation in question should stand at all events if an exception or proviso should perchance prove to be invalid or obnoxious. These facts, we think, clearly require us to uphold, as we do, the validity of § 1 aforesaid. See 82 C.J.S. Statutes § 94 and 2 Sutherland, Statutory Construction, 3d ed., § 2408. The cases above cited in this paragraph do not discuss the matter in the light of such separability clause. The burden of proof that the statute was meant to be indivisible would be upon the parties attacking the constitutionality of the legislation. 2 Sutherland, supra, § 2409; 82 C.J.S. Statutes § 94, p. 166.

3. It is also contended that § 2(a) of the foregoing legislation relating to the issuance of coupons by manufacturers is unwarranted as an illegal classification. The only case which we have found that deals with a statute such as ours is the Maryland case of State v. J. M. Seney Co., supra. That case holds that there is a marked difference between such coupons and the trading stamps such as here under consideration. When manufacturers issue coupons with their goods, everyone is treated alike, anyone, not merchants alone, may buy goods from manufacturers which are accompanied by coupons. The testimony of a number of witnesses who testified in con-

nection with the Casper case stated that no harm to the public results from coupons issued by manufacturers. One witness stated that coupons issued by such manufacturers cost you nothing but that you have to pay for trading stamps here in question. That alone justifies a distinction. We think that the classification is not arbitrary or capricious.

Case No. 2920 involving intervention in the Cheyenne case has become immaterial and the appeal in that connection is dismissed.

The judgment of the District Court of Natrona County, namely the Casper case, is affirmed except as herein stated, and the judgment of the District Court of Laramie County, namely the Cheyenne case, is reversed except as herein stated. No costs will be assessed for the briefs filed in these cases.